### JIM LEEPER AND ED. POWELL v. THE STATE.

*No. 6936.    Decided May 24.    Rehearing refused June 25.*

1.   **Murder—Evidence—Charge of the Court.**—On this trial for murder the State proved first that two persons, for the purpose of robbery, assaulted, shot, and mortally wounded the deceased.    The State then proved that a few minutes after the shooting of the deceased, and at the same locality, three other parties were assaulted by two persons; that one of the said three parties was shot and wounded by the said two persons; that one of the said two persons who made the assault upon the said three parties was the defendant Powell, and that the other one resembled the defendant Leeper, and that the said assault upon the said three parties was made by the said two persons for the purpose of robbing the parties so assaulted.    This proof of the assault upon the said three persons was objected to by the defense upon the ground that it was evidence of extraneous matter; of separate and distinct offenses committed subsequent to the offense charged in the indictment, and that it did not relate to or connect the defendants with the offense on trial.    *Held,* that the objections were properly overruled.    The proof showed that the several assaults, committed at the same place, almost simultaneously in point of time, and for the same manifest purpose, were so closely connected with, related to, and illustrative of each other as to make each *res gestæ* of the other.    Moreover, the evidence was competent upon the questions of identity and motive, was relevant to the main issue in the case, and was not extraneous matter within the rule which requires the charge of the court to restrict the jury in their consideration of extraneous matter admitted in evidence to the specific purpose for which it was admitted.

2.   **Same.**—The State proved that after the arrest and incarceration of the defendant Powell his shirt was removed by the jailer, whereby certain bruises on his body, indicating that he had been struck one or more blows, were discovered.    This proof was objected to upon the ground that it amounted to the coercion of the defendant into giving evidence against himself.    But failing to show that Powell was compelled to expose his body, or that his shirt was removed without his consent, or that any right of the defendants was prejudiced by the proof, the bill of exceptions raises no issue for revision.

3.   **Charge of the Court—Drunkenness.**—In the absence of evidence tending to show the intoxication of the defendants, the trial court did not err in omitting to instruct the jury as to the law where a homicide is committed by a person who at the time is in a state of intoxication.

4.   **Same.—Upon the Law of Circumstantial Evidence** the court gave in charge to the jury the usual form of instruction, but in addition concluded as follows:    "If you can account for or explain the facts and circumstances which you find from the evidence to be true upon any reasonable theory or hypothesis consistent with the innocence of either of the defendants, then as to such defendant you must find a verdict of not guilty."    *Held,* incorrect; but in the absence of exception, and considered in con-

nection with the preceding portion of the charge, and in the light of the evidence on the trial, the error is immaterial.

5. **Same—Continuance.**—Considered with reference to the evidence adduced on the trial, the absent testimony set forth in the defendants' application for continuance was not probably true; wherefore the continuance is *held* to have been properly refused.

6. **New Trial—Disqualification of a Juror—Cases Overruled.**—Article 777 of the Code of Criminal Procedure enumerates the specific causes for which new trials shall be awarded, and none of the causes so enumerated embrace as a ground the disqualification of a trial juror. To authorize a new trial because of the disqualification of a juror who served on the trial it must be further made to appear that probable injury resulted to the defendant by reason of the service of such juror upon the trial. The cases of Lester v. The State, 2 Texas Court of Appeals, 432; Armendares v. The State, 10 Texas Court of Appeals, 44; Boren v. The State, 23 Texas Court of Appeals, 28; and Brackenridge v. The State, 27 Texas Court of Appeals, 513, in so far as they announce the contrary doctrine, are overruled.

7. **Murder—Fact Case.**—See the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

ON MOTION FOR REHEARING.

8. **New Trial—Disqualification of a Juror.**—The ruling on the original hearing as announced in the sixth head note is the only ground relied upon for rehearing which is considered by this court. The majority of the court, adhering to the original determination of this question, announce the doctrine that the courts of this State must be controlled by the statutes of this State, to the exclusion of conflicting rules of the common law or the decisions of other States. Under our statute the disqualification of a juror, although such disqualification did not come to the knowledge of the defendant or his counsel until after verdict, is not of itself a cause for new trial, and can not be made a cause for new trial, unless it be further made to appear that probable injury resulted to the defendant by reason of the service on the trial of the disqualified juror. Furthermore, probable injury not being shown, it is immaterial that a juror disqualified in fact qualified himself on his *voir dire*, and that the defense is not chargeable with laches or want of diligence. For an elaboration of the question see the opinion of Willson, J., on the motion for rehearing.

9. **Same.**—Dissenting from the opinion of the majority on the motion for rehearing, Hurt, J., considering the whole question, holds that while the ground of disqualification of the juror relied upon in this case—i. e., that the juror was neither a householder in in the county nor a freeholder in the State—is not *per se* cause for new trial, still, under certain circumstances other than a showing of probable injury to the defendant by reason of the service on the trial of such a disqualified juror, such disqualification can be made an available cause for new trial; that if, as shown in this case, the juror qualified himself upon *voir dire* as a householder or freeholder, when in fact he was neither, and that if without laches or want of diligence on the part of defendant or his counsel such disqualification was not ascertained until after verdict, then such disqualification, without regard to the question of injury, is available as a ground for new trial, and such facts being affirmatively shown, new trial should be awarded. For an elaborate exposition of the doctrine, see *in extenso* the dissenting opinion.

APPEAL from the District Court of Coryell. Tried below before Hon. C. K. Bell.

The appellants were jointly indicted, tried, and convicted in the first degree for the murder of J. T. Mathis, in Coryell County, Texas, on the 17th day of December, 1889. The death penalty was assessed against each of them.

Alex Largent was the first witness for the State. He testified that in December, 1889, he lived on Cowhouse Creek, in Coryell County. At the time that Mathis was said to have been shot the witness was at Mr. Jackson's house, about a mile and a half from the place where the shooting occurred. That place was on the Gatesville and Lampasas road, near the ten-mile post, and about fifteen steps from the crossing of Riley's Branch. Witness went to that place on the morning after the shooting and found blood stains at a point on the side of the road. Fences at that point formed a lane about fifty yards wide. About thirty steps further west on the road the witness found the place where mules attached to a wagon had turned suddenly around and run. At that point he found the tracks of a man who had evidently seized the head-trappings or bridles of the mules. They showed that the man had either jumped or been pulled around by the mules. From this point the mule tracks led off parallel with the road and then back into the road. The man's track did not follow. At a point about sixty yards east of the branch the witness found where two horses had been hitched either to a bush or to a fence post. The horse tracks at that place were so indistinct—the ground being hard— that witness could not get a good measurement of them. In a swag or marshy place about twenty steps further east the witness found a distinct impression of a horse's foot, and of that track he took an accurate measure. The impression showed it to be a peculiar foot and unusually round in shape. It was the track of a shod horse. When later in the day the sheriff brought the defendant Powell into Gatesville the witness applied his measure to the foot of the bald-faced sorrel horse ridden by Powell. The measure fit it exactly. A 45-calibre cartridge hull was picked up at the place of the shooting.

Dr. J. C. Baird testified for the State that J. T. Mathis was shot on the night of December 17, 1889, and died from the effects of that shot on the morning of December 19, 1889. The fatal bullet entered the left side, and ranging upward passed through one kidney and the liver and out on the right side. By this witness the State, establishing the necessary predicate, proved the dying declarations of Mathis as follows:

"I was coming home from Gatesville. Just after dark, and just after I had passed the ten-mile post and crossed Riley's Branch, some one grabbed my mules which were hitched to the wagon in which I was riding. The mules shied to the right and jumped from the road. Just at this time a man stepped up to the left side of the wagon, presented a pistol at me and said, "Give up your money!" I pulled on the reins, but the mules about this time made a lunge and broke loose from the man who had been holding them. The man at the side of the wagon shot at me, the ball passing just back of my neck. My little boy was sitting by me on the wagon seat, and I pushed him off of the wagon seat down into the wagon bed. Just as I did so I came up even with the man who had hold

of the mules, and he stepped forward, put his pistol close to me, and shot me through. The other man fired another shot at me but missed me. I I fell forward in the wagon. My mules continued to run and soon overtook the wagons of the other members of our party, by whom I was assisted home. I noticed the two men just before my mules were stopped, but supposed it was some of our crowd, and thought nothing about them until the mules were stopped. I did not know either of the men, but I could see that one was considerably taller than the other. The short man was the man who grabbed my mules, and he was also the man who shot me." This dying statement of the deceased was proved in detail, as made to Dr. Baird, by W. M. Mathis.

W. K. Bates testified for the State that he was one of several persons, including the deceased, who took cotton to the Gatesville market on the fatal day. After selling his cotton and receiving about $125 in five dollar bills therefor, the witness went into Holmes's saloon in Gatesville and bought a jug of whiskey. In paying for the whiskey he exhibited his roll of money. Witness did not know whether either of the defendants was in the saloon at that time. The several parties left Gatesville about the middle of the afternoon. The witness passed the ten-mile post about dark. He had traveled about 300 yards beyond that post when he heard three pistol shots fired at or near the said ten-mile post. A few minutes later the witness and his party were overtaken by Mathis's wagon. Mathis, mortally wounded, was lying in the wagon. He was taken home, where he died about thirty-six hours later.

Pete Walker testified for the State that he was in the employ of A. J. Holmes, a saloon keeper in Gatesville, and tended bar on the day Mathis was shot. The defendants were together in Holmes's bar room pretty much all of the time on the day of the shooting, but the witness could not say that either of them was in the bar when Bates bought the jug of whiskey mentioned by him in his testimony.

R. B. Wells testified for the State that on the day of the shooting of Mathis he went to his brother's pasture and returned on the same evening. He traveled the Gatesville and Lampasas road. At about an hour and a half by sun the witness, returning to Gatesville, met two men about two miles from town. As he passed them one of them asked him, "How far is it a mile up the road?" Witness stopped, and observing that the men were strangers he scrutinized them closely. One of the men was the defendant Leeper and the other was the defendant Powell. Leeper was riding a bay horse and Powell a blazed-face sorrel. They were in their shirtsleeves, but had coats tied in bundles behind their saddles. The coats were bulky, and covered what witness took by shapes to be pistols. Witness asked the men their names. Leeper said, "My name is Lusk; I laid six months in jail in this county for killing a man." Witness replied, "That is not so, for I know Lusk, and you are not he." He then asked

witness, "Do you know Albert Leeper?" Witness replied, "I know him well, and you are not he." He then asked the men where they were going. Leeper replied, "We are going as far west as the road is cut out." Witness remarked, "Then you will go a long ways." He replied, "We want to go a long ways." Sheriff Lanham arrested Leeper in Gatesville on the next day, and witness and others arrested Powell at Buster's house. They found at Buster's house the horses ridden by the defendants on the previous day. When arrested Powell's ear was found to be bruised and bloody. After Powell was put in jail his shirt was taken off, and two large whelks or bruises were found on his back, extending from the left to the right shoulder and inclining downward. While the witness was talking with the defendants on the road on the evening of the shooting, W. H. H. Harvey passed in a wagon, going towards Lampasas. A few minutes later the defendants left, going towards Lampasas.

W. H. H. Harvey testified for the State that he and the deceased and others hauled cotton to Gatesville on the day of the shooting. The witness having an ox team started home much earlier than the others of the party. At a point on the road about two miles from Gatesville the witness passed two men talking to R. B. Wells. One of those men was the defendant Powell. He was riding a blazed-face sorrel horse. The other man, whose features the witness did not get to see, was riding a bay horse. When witness reached the point on the road where it was intersected by the Brownwood road, two miles beyond where he saw the men talking with Wells, he looked back and saw the same two men. Thenceforward he watched them, seeing them at intervals until he reached Hard Bargain Springs, which was eight miles from Gatesville. At or near Hard Bargain they passed the witness and traveled on towards the place where Mathis was subsequently shot. W. K. Bates passed the witness at the nine-mile post, and Mathis passed him about a half mile further on. Witness followed as fast as he could make his oxen travel. When he reached a point within 500 yards of the ten-mile post he saw the flash of a pistol fired at or near that post, but on account of the noise made by his heavy wagon he did not hear the report. Immediately after crossing Riley's Branch, just beyond the ten-mile post, the witness saw the defendant Powell and the other man standing on the side of the road. One of them stopped the witness's oxen while the other covered the witness with a pistol, and said, "God damn you, give up your truck!" Witness replied, "All right, gentlemen," but dropped his purse into the wagon bed. About this time two horsemen were heard coming up the road. They proved to be the witness's son Will and Jack Bates. One of the men covered Bates with a pistol and ordered him to stop. Bates did so, and about that time witness's oxen started off. One or the other of the men then ordered the witness to stop the oxen, which the witness did, and climbed out of the wagon. As he did so he turned his whip handle—a large one—so as to

grasp the small end.    He then observed that the defendant Powell, who, was covering his, witness's, son with a pistol, had his back to witness. The witness thereupon struck Powell over the head with the whip handle, the blow glancing so as to strike the left shoulder.    He then struck Powell a blow across the back.    Powell then turned and shot at but missed the witness.    He fired again, the ball striking witness about the left hip, passing out at the end of the spinal column.    Witness fell, and Powell fired again, the ball striking witness in the bottom of the foot.    Powell and the other man then ordered Bates and Will Harvey to leave, which they did. As they started off witness called to Bates, "Oh, Jack!"    Bates replied, "All right, Mr. Harvey," and rode off.    Powell and his companion then approached witness, turned him over and felt of his person.    Powell's companion then said, "Oh hell, he's done for; let's go."    They then left. Powell, the defendant, was the man who shot the witness, and the man who was with Powell was about the size, shape, and make of, and looked like the defendant Leeper.

Jack Bates and Will Harvey corroborated the witness W. H. H. Harvey as to what transpired after they reached the scene of the assault on said W. H. H. Harvey.    Bates testified that in every particular the defendant Leeper resembled the man who covered him with a pistol and robbed him.

Sheriff Lanham testified for the State that he arrested the defendant Leeper in Gatesville on the morning after the shooting of Mathis.    Before placing Leeper under arrest he asked him if he was out on the Lampasas road on the preceding day.    He replied that he was.    Witness then asked him what he was doing on that road.    He replied that he had started to Buster's house, but being under the influence of liquor he went the wrong way; that he discovered his mistake a few miles out from town and returned, reaching town about dusk.    On that same evening witness, Wells, and others arrested Powell at Buster's house, which was in the direction opposite from the place where Mathis was shot, and about twelve miles distant from town.    Powell told the same story as Leeper as to how he came to be on the Lampasas road on the previous day.    Buster showed witness a drawer in his house from which witness got two pistols, one of them being a 45-calibre.    The State closed.

Alibi was the defense interposed by the defendants, but no witness fixed their whereabouts at the time Mathis was shot.    J. V. Buster testified that they came to his house on the Sunday before Mathis was shot.    They left his house to go to Gatesville on the day of the shooting.    Witness did not know when they returned, but they were at his house when he, witness, got up on the next morning.

*J. E. Thomas* and *G. P. M. Turner,* for appellants.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WILLSON, JUDGE. — Over the defendants' objections the State was permitted to prove that a few minutes after Mathis, the deceased, was attacked and shot, and at the same locality, Bates and the two Harveys were assaulted by two persons; that the elder Harvey was shot by said two persons and severely but not mortally wounded; that one of said two persons making said assault was the defendant Ed. Powell, and that the other one resembled the defendant Leeper; that said assault was made by said two persons for the purpose of robbing the persons assaulted. Defendants reserved a bill of exception to the admission of this testimony, from which it appears that the learned trial judge admitted it upon the ground that it was *res gestæ* of the assault made upon Mathis, the deceased.

We coincide with the trial judge in his view of the testimony. The assaults upon Bates and the two Harveys were almost simultaneous with the previous assault made upon Mathis, and were made at the same place. Robbery was manifestly the motive actuating the assailants. They had deliberately planned the robbery of the parties assaulted and had laid in wait for them at the place where the assaults were committed. Each of the assaults was a part of the general scheme—a part of the conspiracy to rob the persons assaulted. They were so closely connected with, related to, and illustrative of each other as to make each *res gestæ* of the other. This testimony was essential to identify the parties who assaulted and shot Mathis, and to show the motive and intent of such assault. It bore directly upon the main issue in the case, and was not extraneous matter within the meaning of the rule which requires that the jury should be instructed to restrict their consideration of extraneous matter adduced in evidence to the specific purpose for which it was admitted. McKinney v. The State, 8 Texas Ct. App., 626; Willson's Crim. Stat., sec. 2344.

We hold that said testimony was admissible, and that it was not required that the court should instruct the jury as to the purpose for which it was admitted and to limit their consideration of it to such purpose.

Furthermore, the main if not the sole reason of the rule which requires the court to restrict the jury in the consideration of extraneous matter admitted in evidence does not obtain in this case. Defendants were being prosecuted for the murder of Mathis by shooting him immediately before the attack was made upon Bates and the Harveys. It was conclusively proved that Mathis died within a few hours from the effects of that shooting. None of the other parties assaulted were killed. Hence the jury could not have been influenced or misled by the testimony relating to the assaults upon Bates and the Harveys to convict the defendants of those assaults. It is not clear to the mind of the writer that in such case, even if the matter admitted in evidence was extraneous, that it would be error to omit to give an instruction limiting its consideration by the jury. It would be the better practice, perhaps, in such case to give such an in-

struction, but it is not necessary that this question should be here determined.

It is made to appear by another bill of exception that after the defendant Ed. Powell had been arrested and placed in jail his shirt was taken off his body by the jailer, and marks or bruises were found upon his body, indicating that he had been struck one or more blows. This testimony was objected to by the defendant upon the ground that it was compelling the defendant to testify against himself. We do not think that the bill of exception shows that any error was committed in this matter. It does not appear that the defendant was compelled to expose his body, or that his shirt was removed without his consent. Nor is it shown by the bill of exception what injury or prejudice might have been caused said defendant by the admission of said testimony. In the manner in which this ruling of the court is presented by the bill of exception it does not appear that any material error, if error at all, was committed. Willson's Crim. Stats., sec. 2368.

There is but one bill of exception reserved to the charge of the court, and that is, that it does not instruct as to the law where a homicide is committed by a person who at the time is in a state of intoxication. We are of the opinion that such instruction was not demanded by the evidence. There is no evidence in the record that the defendants were drunk at the time of the homicide. On the contrary, the evidence shows that the homicide was deliberately committed by persons who evidently were in possession of their full mental powers, and whose purpose was to rob, even at the expense of human life.

Counsel for the defendants object to the charge of the court upon circumstantial evidence. No objection was made to this portion of the charge in the court below. While the last sentence of the said portion of the charge may not be correct and should have been omitted, still the error, if error it be, was not, in view of the evidence in the case and of the preceding portion of said charge, calculated to mislead the jury or in any manner to injure the rights of the defendants. If said portion of the charge had been excepted to we are not prepared to say that we would hold it to be free from error.

With respect to the absent testimony set forth in defendants' application for continuance, it is apparent, we think, in view of the evidence adduced on the trial, that said testimony was not probably true. Hence the refusal of the application for a continuance does not afford good ground for a new trial. Willson's Crim. Stats., sec. 2186.

It is made a ground in the motion for a new trial that B. F. Smith, who served on the jury in the trial of the cause, was not a householder in the county or a freeholder in the State. When tested upon his *voir dire* as to his qualifications to serve as a juror, the said Smith gave an affirmative answer to the question, "Are you a householder in the county or a free-

holder in the State?" Defendants and their counsel state, under oath, that at the time of accepting said juror they were ignorant of his disquali·fication and did not ascertain that fact until after the conclusion of the trial.

We will not stop to inquire into and determine the question as to the competency of the juror, for the reason that the mere disqualification of the juror is not a valid ground for a new trial. It is not a statutory ground. Code Crim. Proc., art. 777. In order to constitute it a good ground for new trial it must be further made to appear that probable injury had resulted to the defendant by reason of such juror having served upon the trial. O'Mealy v. The State, 1 Texas Ct. App., 180; The People v. The State, 6 Crim. Law Mag., p. 334, and note. There are some decisions of this court which hold to the contrary of the rule above stated. Lester v. The State, 2 Texas Ct. App., 432; Armendares v. The State, 10 Texas Ct. App., 44; Boren v. The State, 23 Texas Ct. App., 28; Brackenridge v. The State, 27 Texas Ct. App., 513. These decisions are not, we think, after a more thorough consideration of the question, consistent with the statute, and we therefore overrule them in so far as they hold that the mere disqualification of a trial juror is of itself good ground for a new trial, it not being shown that probable injury has been done the defendant by reason of the disqualified juror serving in the case. In this case it is not shown or even pretended that the juror Smith was not an impartial juror. No fact is made to appear which raises the slightest suspicion of the fairness of the jury which tried the case.

We hold that the court did not err in refusing the new trial because of the disqualification of said juror, even if he was disqualified.

We find the evidence amply sufficient to warrant the conviction and to justify the extreme penalty of the law.

There is no error apparent of record for which the conviction should be disturbed, and it is therefore affirmed.

*Affirmed.*

Judges all present and concurring.

#### ON MOTION FOR REHEARING.

WILLSON, Judge. — A majority of the court adheres to the opinion heretofore rendered. Judge Hurt dissents from that portion of the opinion which holds that the mere disqualification of the juror Smith does not constitute ground for a new trial, and will deliver a dissenting opinion. He concurs in other views expressed in the original opinion. We shall therefore confine our discussion to the question as to whether or not the disqualification of said juror, if in fact he was disqualified, entitled the defendants to a new trial.

We shall not enter upon an investigation and review of authorities, for whatever may be the common law rule, or the rule established by the decisions of other States, we consider that in the decision of this question we must be controlled by our statute.

In this State for more than thirty years we have had a Penal Code and a Code of Criminal Procedure, which having been carefully prepared by distinguished, experienced, and able jurists, were adopted by the Legislature. These codes have been pronounced by the bench and bar of our State to be the most perfect system of criminal laws ever devised. It is declared to be the design of the Penal Code "to define in plain language every offense against the laws of this State and affix to each offense its proper punishment." Penal Code, art. 1. It is declared that the Code of Criminal Procedure "is intended to embrace the rules applicable to the prevention and prosecution of offenses against the laws of this State, and to make rules of proceeding in respect to the prevention and punishment of offenses intelligible to the officers who are to act under them, and to all persons whose rights are to be affected by them." Code Crim. Proc., art. 1.

We regard it as the imperative duty of this court, and of all other courts of this State, in the trial and determination of causes, to be guided and controlled by the statutes of the State, whenever there is a statute applicable to the question presented. Our observation is that many errors have crept into the decisions of the courts of this State, especially in criminal cases, by following common law rules and decisions of other States, overlooking our own statutes. These errors should be corrected whenever detected, and a strict adherence to statutes should be the rule governing courts in their decisions.

With respect to new trials in felony cases our Code of Criminal Procedure is specific, plain, and emphatic. It provides that "new trials in cases of felony shall be granted for the following causes, *and for no other.*" Then follows an enumeration of the causes for which a new trial shall be granted. None of the causes enumerated embrace as a ground the disqualification of a trial juror. What authority, then, has a court to grant a new trial for such cause? If such authority exists it is certainly not conferred by any express provision of the statute. Nor do we think that it is impliedly conferred. One of the statutory grounds for a new trial is, "Where the court has misdirected the jury as to the law, *or has committed any other material error calculated to injure the rights of the defendant.*" Code Crim. Proc., art. 777. Under this subdivision the error committed must be a *material one calculated to injure the rights of the defendant.* Is it *error* for a person who is not a householder or a freeholdes to serve upon a jury? Not necessarily. Such a person is not an illegal juror to the extent that his presence upon the jury will vitiate the verdict. Such disqualification is merely a cause for challenge. If chal-

lenged by the defendant it would be error to not sustain the challenge, but such error would not be *material* unless calculated to injure the rights of the defendant. In such case this court would not set aside the conviction unless it was made to appear that the defendant exhausted his peremptory challenges and was compelled to accept an objectionable juror. Willson's Crim. Stats., sec. 2293.

In the case we are considering the juror was not challenged by the defendant. The juror having by his answers under oath shown that he was qualified, the court could not do otherwise than require the parties to pass upon him. Was this *error?* But if error, was it *material* error? It is not shown or pretended that the juror was not *fair and impartial.* It is not shown that he was corrupt, had been convicted of any felony, or was under indictment for felony, or that he was insane, or had such bodily or mental defects as rendered him unfit for jury service, or that he had been guilty of any misconduct as a juror. How then can it be said that his being a juror in the case *was calculated to injure the defendant?* Does the mere fact that a juror does not have a house or does not own land in this State render it probable that he would not try an accused person fairly and impartially? True, it is the policy of the law that jurors shall be either householders in the county or freeholders in the State, but we do not believe that this policy is founded on the supposition that the non-householders and non-freeholders in our State are morally unfit to serve as jurors. We think the reason of the policy is to induce men to become permanent citizens; to identify their interests with the interests of the State; to add to the prosperity of the community in which they are by having homes and by owning and cultivating lands and paying taxes thereon.

In conclusion, we will say that we rest our decision of this question upon our statute. We think the statute is not only plain but mandatory that a new trial in a felony case should not be granted because of the disqualification of a trial juror, although such disqualification was unknown to the defendant at the time of the trial, and although such want of knowledge was not because of any fault on the part of defendant or his counsel.

The motion for rehearing is overruled.

### DISSENTING OPINION ON THE MOTION FOR REHEARING.

HURT, JUDGE.—I desire to discuss but one question.

B. F. Smith, a juror in the case, was neither a householder in the county of the trial nor a freeholder in the State. He was examined touching these facts, and on his *voir dire* qualified himself by swearing that he was a freeholder in the State. That he was not a freeholder was unknown to appellants or either of them or to their counsel, and the fact that he was neither a householder nor a freeholder was ascertained after verdict.

Under the above state of facts the counsel for appellants, upon the

ground that Smith was neither a householder nor freeholder, moved for a new trial. This motion was overruled.

Was this error?

In the Criminal Law Magazine (vol. 6, p. 336) will be found a note to the opinion of Cooley, C. J., in the case of The People v. Scott. This note was written by Mr. Eugene McQuillan. In this note will be found two propositions:

1. "The fact that a recognized cause of challenge existed at the time of the impaneling of the jury and was not discovered until after verdict will not *per se* constitute a ground for new trial."

2. "Whether a new trial will be granted for this reason rests largely in the sound discretion of the court. The facts of each case must direct the judicial discretion. The essential question is one of prejudice to the prisoner. Have any legal rights been denied him? The error must be of the essence of his rights. Has the proceeding resulted in an unjust verdict?"

Before disussing these propositions I desire to notice our statutes on this subject.

Article 3009 of Revised Statutes of this State provides that "All male persons over 21 years of age are competent jurors, unless disqualified under some provision of this chapter."

Article 3010 provides that "No person shall be qualified to serve as a juror who does not possess the following qualifications: * * * 2. He must be a freeholder within the State or a householder within the county."

Now if these were all the statutory provisions bearing upon this subject I would hold that a juror lacking these qualifications would be disqualified in the largest sense; that is if such a juror were to be impaneled the jury— the panel—would be illegal. There would not be a jury at all. The panel would be composed of but eleven men.

But article 636 of the Code of Criminal Procedure provides as follows: "A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. It may be made for either of the following reasons: * * * 2. That he is neither a householder in the county nor a freeholder in the State."

Article 639 of the same code provides that "no juror shall be impaneled when it appears that he is subject either to the third, fourth, or fifth cause of challenge in article 636, although both parties may consent." The third clause is "that he has been convicted of theft or any felony;" the fourth "that he is under indictment or other legal accusation of theft or any felony;" and the fifth "that he is insane, or has such a defect in the organs of seeing, feeling, or hearing, or such bodily or mental defect or disease as renders him unfit for jury service."

If such a person or persons as are described in these clauses were impaneled the jury would be illegal—it would be no jury—and hence with-

out authority to render a legal verdict. Such persons can not be impaneled. This is expressly forbidden by the statute, though the parties may consent thereto.

I am of the opinion, from a comparison of the different provisions of the statutes bearing upon this subject, that unless the juror is subject to some cause of challenge named in clauses 3, 4, and 5 of article 636 of the Code of Criminal Procedure, he is not an illegal juror; that if impaneled the jury thus composed would not be without authority to render a legal verdict. Hence, if the objection to the juror be that he is neither a householder nor a freeholder, this would be ground for challenge for cause, but if such a juror served the verdict would by legal. It would be the act of a legal jury.

And so a jury, one member of which had formed an opinion that the accused was guilty and should be convicted, would be a legal jury. Code Crim. Proc., art. 636, sub-div., 13. So with a jury including a member who was a non-voter in the State and county. Code Crim. Proc., art. 636, sub-div. 1.

But does it follow that because a jury thus composed is a legal jury that therefore the impaneling of such a juror under no circumstances would not taint the verdict so as to require a new trial to be granted in the case?

The law-making power of this State declares that no person, unless a householder in the State, shall be qualified to serve as a juror. It also declares that for the want of this qualification either party may challenge the juror.

While a jury composed of a person who is neither a householder nor freeholder may be a legal jury with authority to render a legal verdict—a verdict which is not absolutely void—still, under certain circumstances, may not a verdict rendered by such a jury be voidable? If so, under what circumstances?

I will return to Mr. Eugene McQuillan's note. The propositions stated by him and inserted above are quite general and are wanting in specification. The first is that the fact that a cause of challenge existed at the time of the impaneling of the juror, and was not discovered until after verdict, will not *per se* constitute a ground for new trial. This proposition may or may not be correct. If the cause of challenge was such as rendered the juror incapable of serving on a jury, such as are enumerated in clauses 3, 4, and 5 article 636 of the Code of Criminal Procedure, then the impaneling of such a juror *would* be ground *per se* for new trial. And while it may be true that the impaneling of a juror obnoxious to challenge for cause, though the cause was not discovered until after verdict, may not *per se* be ground for new trial, this writer does not say or intimate that under no circumstances would the impaneling of such a juror be ground for new trial.

I admit the correctness of the rule as above stated, but it is of little

value in solving the question in hand. If, under certain circumstances, the impaneling of such a juror may be ground for new trial, the question is, what must those circumstances be to authorize a new trial?

Suppose the juror is questioned by the court or by the defendant or his counsel, and under oath qualifies himself by stating that he is a freeholder in the State; that neither the defendant nor his counsel knew to the contrary, and that this fact was discovered after verdict. Would these circumstances, under the provisions of the statutes of this State, demand a new trial?

Before answering this question I desire to notice the authorities referred to by Mr. McQuillan in support of his first proposition.

About forty cases are cited, all of which, with few exceptions, I have examined, and I have not found a case in which it is held that a new trial will not be granted under the facts which present the question in this case. In fact, no case in the list cited contains a similar state of facts. After giving these cases a thorough examination I am prepared to state that more than two-thirds of them simply decide that as the juror was not tested by the court or defendant regarding the cause for challenge, it is too late after verdict, and for this reason the new trial was refused.

In some of the cases the new trial was refused for the reason that the defendant or his counsel knew of the cause of challenge before the juror was impaneled; or because the motion did not negative such knowledge. But in most of them the new trial was refused expressly for the reason that the juror was not tested on *voir dire*. Now, what the ruling on the motion for new trial would have been under the facts attending the question in this case we are not informed. But it is reasonable to infer that the motion would have prevailed. Why? 1. Because it was unnecessary, yea, foolish, to enter into a contest over the evidence adduced bearing upon the fact as to whether the juror had been tested or not as was done in several cases. 2. When the motion came up for the ruling of the court it would have been a sufficient reason for rejecting it for the court to say, "No injury is shown, and that is the test." This would, in a great many cases, have eliminated from the motion all evidence offered for the purpose of showing that the juror had or had not been examined touching his qualifications as to the cause of challenge relied on for new trial. Dilworth v. The Commonwealth, 12 Grat., 686. The issue—injury *vel non*—would have been the first to decide, and then inquire as to the diligence. But in none of these cases is the question of injury to the defendant discussed, except in cases in which the cause of challenge was bias or prejudice, or that the juror had before trial formed an opinion against the defendant.

The rule at common law was that no juror could be challenged by the defendant without consent after he had been sworn, unless it be for some cause happening after he was sworn; that "the challenge *propter defectum*

should be made as the juror is brought to the book to be sworn. If not then made the defendant waives his challenge." This rule was applied in Davis v. The State, 80 North Carolina, the facts being that one of the jurors was an atheist, which was not discovered by the prisoner until after verdict. In that case we are not informed whether the prisoner or his counsel knew of the cause of challenge before the juror was sworn, or whether the juror was examined as to this cause of disqualification or not. The common law rule cited seems to have been quite broad, and would have denied the right to the prisoner to urge as a ground for new trial any disqualification of a juror, without regard to the diligence used by the prisoner or any other fact. If the juror had formed a settled opinion that the accused was guilty, had been questioned as to such an opinion, had under oath denied that he entertained any opinion as to the guilt of the prisoner, and if the prisoner and his counsel had been ignorant of such opinion, still under the rule cited there was no relief for the prisoner. I will not stop to discuss such a rule, remarking, by the way, that it does not obtain in any State of the Union.

Now I desire to state the rules which are applicable to the different state of facts which may ordinarily surround this question:

1. If a person is incapable of being a juror under any circumstances, a jury with such a person as a member would not be a legal jury, and a verdict rendered by a jury thus formed would be absolutely void. The prisoner could attack the verdict in a motion for new trial whether he knew of the disqualification or not, or whether he examined the juror touching such disqualification or not.

2. The juror being obnoxious to challenge for cause, as in this case, if the prisoner knew of the cause and failed to urge it before the jury is sworn, or if the juror was not examined touching his qualification, though the cause was not known to the prisoner or his counsel, he is presumed to have waived his objection, and will not be allowed to urge the disqualification for new trial. Our Supreme Court holds that if the juror had formed an opinion against the accused, or was prejudiced against him, he will not be deprived of the right to insist upon this as a ground for new trial, though he did not examine the juror upon his *voir dire* as to his prejudice when the jury was being impaneled. Hanks v. The State, 21 Texas, 526; Henrie v. The State, 41 Texas, 573.

3. If the juror is disqualified and is subject to challenge for cause, if he is examined on his *voir dire* and qualifies himself, his disqualification being unknown to the prisoner and his counsel, still the defendant can urge the disqualification as ground for new trial. Shumaker v. The State, 5 Wis., 324. In the case cited the juror was disqualified because an alien; and it also appears that he had not been examined as to that fact. Gilhooly v. The State, 58 Ind., 182. In this case the court say, "So if the defendant accepts a juror without questioning him as to his qualification

he cannot afterwards object that the juror was neither a freeholder nor householder, both statutary qualifications.    But if on his *voir dire* such juror misleads the court and the parties as to such qualifications, and is accepted as a juror, the defendant is entitled to a new trial."    To the same effect is Patterson v. The State, 70 Ind., 341.

This question is elaborately discussed by Graham & Waterman in their work on New Trials, in reviewing the case of Briggs v. George, 15 Vermont, 6.    After verdict for the defendant, the plaintiff in that case moved for a new trial on the ground that one of the jurors who sat in the trial of the case was not a freeholder, which fact plaintiff did not know at the time, the statute requiring the jurors to be freeholders.    A new trial was granted upon this ground alone.    Judge Bennett dissented.    His dissent rested mainly upon these grounds:    That the objection to the juror was not such as affected his character or impugned the fairness or impartiality of the trial, and that no injury was shown.

Replying to these objections the authors say:    "The assumption of the learned judge who delivered the dissenting opinion in the foregoing case that the objection to the juror was not such as affected his character or impugned the fairness or impartiality of the trial, is deprived of all its force from being in direct contradiction to the law.    The statute, by excluding such persons from the panel as do not possess certain prescribed qualifications, impliedly declares that those who enter the jury box without them are unfit to serve.    Nor can the parties be presumed to know whether the officers charged with summoning jurors have complied with the necessary formalities and selected only such persons as are declared by law to be competent.    They have a right to suppose that the officers have done so; nor would they be likely in the first instance to suspect to the contrary.    If, therefore, they are not apprised of such objection until after verdict, they can not justly be charged with negligence or be deemed to have waived their rights.    Unnumbered evils would flow from permitting courts to practically annul statutes by refusing to be guided by them, under the plea that it could make no difference with those for whose protection or benefit the statute was designed.    Were such a course pursued, the justice and propriety of a statute, rather than the statute itself, would come to be regarded by courts; and the latter would arrogate to themselves the right to obey or disobey the law, according as it should meet their approbation or the reverse.

"The law declaring that no person who is not a freeholder shall serve upon juries is founded upon grounds of public policy which demands that persons exercising so important a duty shall be owners of the soil, and therefore bound to law and order by pecuniary interest, and is intended as an additional guarantee to suitors that their rights shall be adjudicated upon and decided upon by responsible persons who have themselves something at stake and are dependent upon the correct administration of jus-

tice for the preservation of their own rights. But whether such a law be sound and wholesome or the contrary, we can not see that in principle it differs from other statutes regulating the trial of causes; that courts have any more right to treat it as a dead letter, or that parties are to be precluded from availing themselves of it either after or before verdict. It is true that where the cause has been fully and fairly tried on the merits the ordering of another trial is practically unnecessary, imposes great hardship upon the successful party, consumes the time of the court, multiplies litigation, and endangers justice. But still, the upholding and observance of the law is superior to all these considerations, and the least departure from it is so fraught with dangerous consequences as to render it imperative upon those charged with the administration of justice vigilantly and jealously to guard against every deviation."

In the above case the juror was not tested, the learned authors holding that this was not required, as the parties have the right to suppose that the officers have done their duty by selecting only such persons as are declared by law to be competent. The case, though a civil one, is directly in point.

In it, however, a very important fact was omitted. The juror was not examined as to whether he was a freeholder. In the case now before us this was done. In the Briggs case the disqualification was not fatal to the panel. So we have admitted in this case. No injury was shown in the Briggs case, nor can injury be shown in this case, unless a deprivation of a legal right be an injury. See also The State v. Babcock, 1 Conn., 401.

But it is contended that injury must be shown. If this be so, then the discussion ends. If this proposition be correct, then thousands of pages would not have been written upon the doctrine of waiver. See this doctrine discussed in Graham & Waterman on New Trials, vol. 2, p. 220. Read the discussions upon this doctrine in not less than a hundred cases to be found in the books of the library, but too numerous to be inserted here. Now, why enter into elaborate arguments relating to the failure to examine the juror as to whether he was a freeholder, householder, citizen, voter, an atheist, etc., if a new trial could not be granted unless injury is shown? It is absolutely impossible to show injury because a non-freeholder sat on the jury.

But it may be urged that if the juror was prejudiced or had formed an opinion against the prisoner, injury would be shown and a new trial would be granted. The new trial would be granted because of the prejudice or opinion, not because the juror was not a freeholder. His disqualification for want of a freehold would have nothing to do with the motion. The merits of the motion would rest upon the prejudice or opinion and not upon the other cause.

Just here I wish to submit some observations regarding the second proposition of Mr. McQuillan. He says that injury must appear, and refers

us to a number of cases in support of the rule.    When these cases are con-
sulted it will be found that the objection to the juror was prejudice or
opinion against the prisoner.    Now, in passing upon the motion for new
trial the courts, after hearing the evidence bearing upon prejudice or
opinion, decide the question of prejudice or opinion formed, just as is
done if the juror had been questioned on *voir dire* and answered stating
the condition of his mind, or just as the question would have been decided
upon the evidence adduced when the juror was being tested.    If the juror
was not prejudiced, or had not formed such an opinion as would render
him partial, the challenge for cause would have been overruled.    And so
it is when this matter is brought forward in a motion for new trial.

In discussing this question it is frequently stated that no injury to the
prisoner appears.    Now, in a few cases, among which is found the dis-
senting opinion of Justice Bennett in the Briggs case, the absence of in-
jury is urged as a reason for refusing a new trial.    In the Briggs case the
objection to the juror was a want of freehold.    But in the overwhelming
majority of cases the reasons for refusing the new trial are:   1. Knowl-
edge of the cause for challenge when the juror was impaneled.   2. Fail-
ure in the motion to negative knowledge.   3. Waiver of objection because
the prisoner knew of the disqualification or failed to examine the juror
touching the disqualification relied on for new trial.

Were the appellants in this case deprived of a legal right?  And if so,
can they avail themselves of their rights by motion for new trial?

Before answering this question I desire to observe that as the appellants
and their counsel were ignorant of the disqualification when the juror was
impaneled, and as the juror, on oath, qualified himself by stating that he
was a freeholder, no laches can be attributed to them, and hence the doc-
trine of waiver is not applicable.

The appellants occupy the same position as they would have done if the
juror had stated that he was neither a freeholder nor householder, and
the appellants had challenged him for cause, and the court had overruled
the challenge.   Why?   Because, being ignorant of the cause for challenge,
and having used all the diligence required of them in reason and in law,
and being misled, whether ignorantly or corruptly, they certainly can not
be held to have waived their right to demand a qualified juror.

Our statute excludes from the panel a person who is neither a house-
holder nor freeholder, thus impliedly declaring that those who enter the
jury box without these qualifications are unfit to serve.    In this case the
appellants, without any fault on their part or on the part of their coun-
sel, have been tried by a juror declared to be disqualified and unfit to try
them.    Such persons are placed by the State, through her law-making
power, under a very dark cloud; they are badly treated; they are not sus-
pected merely, but are emphatically declared unfit to try a case; and while
it may be true that the disqualification is not such as affects the juror's

character and impugns the fairness and impartiality of the trial, still the appellants have been deprived of a legal right without fault. This being the case, have they relief by motion for new trial?

It is contended that our code forbids the granting of a new trial for this cause unless injury is shown. Let us examine this proposition. This should be treated as a practical question, and if this rule is to be applied to this question it should be applied in all cases requiring injury to be shown as a condition precedent to the granting of a new trial. What is meant by injury? Must there be injury in fact, or injury in law? If in fact, let us extend the rule to other phases of this subject and to distinct subjects.

Let us suppose, for instance, that the juror had disqualified himself by answering that he was neither a householder nor a freeholder; that the appellants challenged him for this cause; that the court overruled their challenge and permitted the juror to set in the case; and that the appellants objected, reserving their bill. This matter being brought forward in motion for new trial, should their motion for new trial prevail? By no means, if actual injury must be shown, because no injury appears, and can not possibly be made to appear.

Take another illustration: The prisoner challenges A peremptorily. The court overrules the challenge, and a bill is reserved. Can he obtain relief by motion for new trial? Not if he must show actual injury. And in neither of the supposed cases can he obtain relief by motion in arrest, because there is no defect in the indictment.

Again, suppose he moves to quash the special *venire* in a capital case; that his motion is well taken, but is overruled, and he excepts. What is his remedy? By motion for new trial? No. Why? Because no actual injury is shown. By motion in arrest? No; because there is no defect in the indictment.

Now, it will not be denied that in the cases put the prisoner would be entitled to a new trial. Upon what ground? Simply that, without fault on his part, he has been deprived of a legal right. Hence, in law, there is a legal injury, for which injury he has a legal remedy. If these propositions be incorrect, then, in the language of the distinguished authors of the quoted work on New Trials, "the justice and propriety of statutes, rather than the statute itself, would come to be regarded by courts, and the latter would arrogate to themselves the right to obey or disobey the law, according as it should meet their approbation or the reverse."

In conclusion, upon this subject I desire to observe that, "while it may be true, when a case has been fairly tried upon its merits, a new trial may appear practically unnecessary, imposing great hardships upon the successful party, consuming the time of the court, multiplying litigation, endangering justice, and liberating, in many cases, persons who are evidently guilty of the most atrocious crimes—yea, bloody-handed assassins—

still the observing of the law is superior to all these considerations, and the departure from it is so fraught with dangerous consequences as to render it imperative upon those charged with the administration of justice vigilantly and jealously to guard against any deviation."

Concede that the appellants are guilty of murder of the first degree. Concede that they have been tried by an impartial jury. Concede that they deserve the severest punishment known to our law. Still they have not been tried by such a jury as is guaranteed to them by the State, the complainant in this case. The plaintiff in the case—the State itself—by its law-making power declares that unless a householder or a freeholder a person is not fit to try her citizens. Without fault, without laches, without negligence of any kind, these appellants have been tried by a juror who is thus condemned and repudiated by the plaintiff—the State. They have not been tried legally, but illegally. They have thus been tried without fault on their part. They have been denied a legal right. They certainly should have a legal remedy, which remedy is a new trial.

The writer was misled by Mr. McQuillan's note, and was as much responsible for the opinion in this case as Judge Willson, who wrote it. But after having most thoroughly examined the cases cited in the note, he is clearly satisfied that the ruling of the court in the original opinion is wrong, and that a rehearing should be awarded and the judgment reversed.

*Motion overruled.*