# Moss v. State.*

## (*Nashville.* December Term, 1914.)

**1. SUNDAY. Trial.**

Unless authorized by statute, court cannot be held on Sunday; hence it is improper for the judge in a criminal case to charge the jury on Sunday. (*Post, pp.* 97-103.)

Cases cited and distinguished: Gholston v. Gholston, 31 Ga., 625; Jones, Adm'r, v. Johnson, 61 Ind., 257; McCorkle v. State, 14 Ind., 39; People v. Odell, Dak. 197; Swann v. Broome, 3 Burrowes, 1955.

**2. COMMON LAW. Effect of.**

The common law of England as it stood at and before the separation of the colonies is law in Tennessee, being derived from North Carolina, out of which State the State of Tennessee was carved, for Acts N. C. 1715, ch. 31, and Acts N. C. 1778, ch. 5, preserved the common law, while Cession Act 1789, ch. 3, provided for its continuance in the State of Tennessee. (*Post, pp.* 103-106.)

Cases cited and approved: Shute v. Harder, 9 Tenn., 5; State v. Miller, 79 Tenn., 626; Box v. Lanier, 112 Tenn., 393; Fields v. State, 9 Tenn., 158; Porter v. State, 8 Tenn., 226; State v. Miller, 79 Tenn., 620; Nunnely v. Doherty, 9 Tenn., 27; Egnew v. Cochran, 39 Tenn., 320.

Cases cited and distinguished: Tisdale v. Munroe, 11 Tenn., 320; Smith v. Bank, 115 Tenn., 12; Glasgow's Lessee v. Smith & Blackwell, 1 Tenn., 144.

**3. COMMON LAW. Effect of.**

The Tennessee Code governs, in case of conflict between its provisions and the common law. (*Post, pp.* 103-106.)

**4. COMMON LAW. Existence of custom. Question for court.**

Every general custom is a part of the common law, and the existence of a general custom, as the one not to hold court on Sunday, is a question for the courts. (*Post, pp.* 106-110.)

---

*The question of receiving a verdict on Sunday is treated in a note in 39 L. R. A. (N. S.), 844.

Moss v. State.

Acts cited and construed:  Acts 1741, ch. 14, sec. 2; Acts 1777, ch. 8, sec. 6.

Code cited and distinguished:  Secs. 3029, 3031, 4623, 5940, 6993, 6994 (S.).

Cases cited and approved:  Styles v. Harrison, 99 Tenn., 128; City of Parsons v. Lindsay, 41 Kan., 336; Henderson v. Reynolds, 84 Ga., 159; State of Louisiana v. Keatine, 130 La., 434.

5. **SUNDAY.  Holding of court.**

The common-law rule, that court cannot be held nor ordinary business transacted upon Sunday, is recognized by Code 1858, secs. 1723, 1724, 2902 (Shannon's Code, secs. 3029, 3031, 4623), prohibiting the carrying on of ordinary duties on that day. (*Post, pp.* 106-110.)

6. **SUNDAY.  Charging of jury.  Holding court.**

The charging of a jury is a high judicial function, and, when the jury were charged on Sunday, court was held on that day. (*Post, p.* 110.)

7. **CRIMINAL LAW.  Appeal.  Review.  Harmless error.**

Where court was improperly held on Sunday, such action cannot be disregarded as a mere irregularity, under Acts 1911, ch. 32, for it is equivalent to holding court at a place not authorized.  (*Post, pp.* 110, 111.)

Acts cited and construed:  Acts 1911, ch. 32.

---

FROM PUTNAM.

Appeal from the Criminal Court of Putnam County. —J. H. GARDENHIRE, Judge.

W. BRYANT, V. E. BOCKMAN, J. A. CONLIN, B. G. ADCOCK and P. C. CROWLEY, for appellant.

WM. H. SWIGGART, JR., Assistant Attorney-General, for the State.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error was indicted in the criminal court of Putnam county, at the September term, 1910, for the murder of H. S. Gill. He was tried and found guilty of murder in the first degree with mitigating circumstances at the May term, 1914, and judgment was rendered that he be confined in the State penitentiary during his natural life. He made a motion for a new trial in the lower court, which was overruled, and he has appealed to this court and assigned errors.

We deem it unnecessary to notice any of the errors assigned, except one based upon the following facts: The minutes of the court for Saturday, May 23d, recite that the hearing of testimony was concluded on that day, and the arguments of counsel continued until 11:30 p. m., and that no formal adjournment of court was taken, but the sheriff was directed to bring the jury into court on the next morning. Following this an entry appears, as of date May 24th, reciting that the court met pursuant to adjournment; present and presiding the Honorable J. M. Gardenhire, Judge, etc. The entry then proceeds as follows:

"No formal proclamation of the opening of court was made by the sheriff, the court not formally having adjourned, but having taken a recess until this time for the purpose of the court's delivering his charge to the jury in the case of *State of Tennessee* v. *McConnell Moss,* charged with murder."

It is then recited, under the proper style of the case, that the attorney-general was present for the State, and also the defendant in his own proper person and by counsel, and that the jury also came, giving the names of the members of the jury, etc.,

"and said jury having heard all of the evidence on both sides of the case, and having heard the arguments of counsel, the court proceeded to read his charge to the jury, which was delivered to them in writing, and said jury, having received the charge of the court in writing, retired, in charge of their sworn officers aforesaid, to consider of their verdict, carrying with them said written charge of the court and indictment in the case. This charge was delivered at 11 o'clock a. m., Sunday, May 24, 1914."

The minutes on Monday, the following day, recite in regular form that the jury having heard all the evidence and the arguments of counsel, and having received the charge of the court, returned their verdict into open court.

The question presented is whether the trial judge could lawfully hold court and charge the jury on Sunday.

In a long experience on the bench the writer of this opinion can recall no instance in which a similar attempt was ever before made in this State by any of our trial judges, nor can any other member of the court recall such instance. Some authorities have been submitted to us from other jurisdictions in which such

131Tenn7

a practice has been measurably sanctioned under special circumstances or by statute, but only two cases have been brought to our attention where such an attempt has been made in the absence of a statute. One of these cases is *Gholston* v. *Gholston,* 31 Ga., 625, 638. A brief excerpt from the opinion in this case will show all that appears on the subject. Said the Court:

"The court was actually delivering the charge to the jury on Saturday night, when the hour of 12 o'clock arrived, and the Sabbath day, according to our computation of time, had commenced before he concluded. This may have been an inadvertence, but, under all the circumstances, was certainly no very grave error. . . . Whatever judicial action was had on the Sabbath day was either inadvertent or inevitable. . . . We think that what transpired on the Sabbath was not sufficient to vitiate the verdict, holding, at the same time, that all courts should abstain from the transaction of ordinary business on that holy day."

The next instance is *Jones, Adm'r,* v. *Johnson,* 61 Ind., 257, 264. The point in decision was that the trial judge committed error in entering the jury room on Sunday and instructing the jury in the absence of the parties and of their counsel. After quoting a passage from *McCorkle* v. *State,* 14 Ind., 39, to the effect that the law permitted a verdict to be returned on Sunday, and as an incident authorized the court to sit on that date to receive any motion or order touching it, and to discharge the jury after rendering it, continued:

Moss v. State.

"We may add, as a further incident to this authority to receive a verdict on Sunday, that in our opinion, if it should appear to be necessary to a speedy formation and return of a verdict, and the jury should desire to be informed on that day as to any part of the testimony, or as to any point of law arising in the case, the court may sit on Sunday for the purpose of giving the jury any information required, in the presence of, or after notice to, the parties or their attorneys."

It is perceived that what was said in this case upon the subject of instructing the jury was *dictum,* since the ground of reversal, and the only point under examination, was the action of the trial judge in going into the jury room and giving additional instructions, in the absence of and without notice to the parties or their counsel.

In the Georgia case the matter was treated as merely an inadvertence, and, if not so, as a necessity.

We are referred to the case of *People* v. *Odell,* 1 Dak., 197, 203, 46 N. W., 601, 603. A short excerpt from that case will sufficiently show its substance:

"It appears from the record that the jury was charged and retired to consider of their verdict about 9 o'clock on Saturday night, and that at 3 o'clock on Sabbath afternoon, the jury not having agreed, the judge, on his own motion, had them brought in and delivered to them further instructions, by way of correcting a supposed error in his former charge, and this is assigned as error. It is claimed that, this being a judicial act, it could not be done on the Sabbath.

The Sabbath being *dies non juridicus,* it is doubtless the well-settled general rule that no judicial act can be done on that day. But the jury being out, they are not permitted to separate until they have agreed upon their verdict, or are discharged by the court from further consideration of the case. The Code of Criminal Procedure provides (section 338) that 'while the jury are absent the court may adjourn from time to time as to other business, but it is nevertheless deemed open for every purpose connected with the case submitted to them until the verdict is rendered or the jury discharged.''

So it was held that under the statute the court was to be considered open for such case.

In the absence of a statute authorizing it, there can be no doubt that it is unlawful for a court to do any judicial act on Sunday. The leading case is *Swann* v. *Broome,* 3 Burrows, 1955—year 1764. In this case Lord Mansfield reviewed the whole subject. He said that anciently the court sat on Sundays; that the ancient Christians practiced this for two reasons: One was in opposition to the heathen, who were superstitious about the observation of days and times, conceiving some to be ominous and unlucky and others lucky; that therefore the Christians laid aside all observance of days; that a second reason they had was that by keeping their own courts always open they prevented Christian suitors from resorting to heathen courts. But he further observed that in the year 517 a canon was made forbidding the adjudication of causes on

Moss v. State.

Sunday; that this canon was ratified in the time of Theodosius, who fortified it with an imperial constitution.  He referred to other subsequent canons adding other holy days.  These canons, it seems, were received and adopted by the Saxon kings of England, and were all confirmed by William the Conqueror and Henry II, and so became part of the common law of England. That in the course of time, other days were disregarded as nonjudicial, but Sunday retained.  It was held that, while merely ministerial acts might be done on Sunday, no judicial act could be performed.  For example, the rendering of a judgment or the awarding of a process, since these acts could not be supposed to be done but whilst the court was actually sitting.  Said his lordship:

"As to the observation 'that the courts of justice have never been restrained by act of Parliament from sitting on Sundays, and that St. 29 Car. 2, ch. 7, does not extend to giving judgments, it was needless to restrain them from it by act of Parliament.  They could not do it, by the canons anciently received and made a part of the law of the land.  And therefore restraining them from it by act of Parliament would have been merely nugatory.  . . . In McCalley's Case in 9 Co. it was objected that Sunday is not *dies juridicus,* and that therefore no arrest can be made in it, and every one ought to abstain from secular affairs on that day.  But it was answered and resolved that no *judicial* act ought to be done in that day, but *ministerial* acts may be lawfully executed in Sunday.''

To the same effect is 4 Bacon's Abridgment, page 640:

"By the common law *dies dominicus non est juridicus.* No plea therefore shall be holden *quindena Paschae,* because it is always the Lord's day, but it shall be *crastino quindenae Paschae.* F. N. B. 17, f. So, upon a fine levied with proclamations according to the statute of 4 H. 7, ch. 24, if any of the proclamations are made on the Lord's day, all the proclamations are void, for the justices may not sit upon that day, being a day exempt from business by the common law for the solemnity of it, to the intent that all people may apply themselves that day to prayer and serving God." Finch's Law, 7.

In Wharton's Legal Maxims, the maxim *"dies dominicus non est juridicus"* is correctly rendered: "The Lord's day (Sunday) is not juridical, or a day for legal proceedings." He adds: "None of the courts of law or equity can sit on this day."

So it has been held that no indictment can be found on Sunday, and that every indictment should have a caption showing the day on which it was found so that it might appear that it was not found on Sunday. 8 Bacon Abridg., 701; 2 Saund., 290; Vent., 107; 2 Keb., 731. Nor can a writ of inquiry be executed on Sunday. 4 Bacon, Abridg., 640; Fortesc., 373; 1 Str., 387.

The chancery court was never adjourned, standing open at all times, but only for the issuing of writs, in its function of *officina brevium.* Choyce Cases in

Chancery, 85; 2 Bac. Abridg., 681; 4 E., 4, 2; 4 Inst., 80.

So stood the common law at and before the separation of the colonies from the mother country. That law, in general terms, is the law of Tennessee. We say, in general terms, because we derive it through our mother State, North Carolina:

"Our ancestors brought, upon their emigration, the common law with them as their rule of action, and still retained it where applicable; so it was declared upon the first settlement of North Carolina, in Acts 1715, ch. 31, sec. 6. So also after the Revolution in 1778 it was again declared 'that all such parts of the common law, as were heretofore in force and use within this territory, . . . as are not destructive of, repugnant to, or inconsistent with, the freedom or independence of this State, and the form of government therein established, and which have not been otherwise provided for, in the whole or in part, abrogated, repealed, or expired, . . . are hereby declared to be in full force within this State.' Act April, 1778, ch. 5, sec. 2." *Fields* v. *State,* 1 Yerg. (9 Tenn.), 158, 159; *Porter* v. *State,* Mart. & Y. (8 Tenn.), 226, 227, and cases cited on latter page; *Tisdale* v. *Munroe,* 3 Yerg. (11 Tenn.), 320, 323, 324; *State* v. *Miller,* 11 Lea (79 Tenn.), 620, 624-629; *Smith* v. *Bank,* 7 Cates (115 Tenn.), 12, 17 to 19, 89 S. W., 392, 393.

As said in the latter case:.

"The cession act, enacted by the general assembly of North Carolina in 1789 (Act 1789, ch. 3), and accepted

by the Congress of the United States April 2, 1790, provided that the laws in force and in use in North Carolina at the time of passing that act should be and continue in full force in the territory ceded until the same should be repealed or altered by the legislative authority of the territory. *Nunnely* v. *Doherty,* 1 Yerg., 27.

"And by our constitutions adopted in 1796 and 1834 it was provided that all laws then in force in the territory previous to 1796, and those in Tennessee previous to 1834, not inconsistent with those instruments, respectively, should continue in force until they should expire, be altered, or repealed by the general-assembly. *Egnew* v. *Cochrane,* 2 Head, 320.

"This was the *status* of the common law and the statutes of North Carolina previous to the cession act, in Tennessee, save as modified by subsequent legislation, until the adoption of our Code of 1858, which superseded all other statutory law in this State, except as therein specially provided. Code 1858, sec. 41 (Shannon's Code, sec. 58); *State* v. *Miller,* 11 Lea, 626."

In *Tisdale* v. *Munroe,* supra, the court said that as to British statutes not previously in use in North Carolina, and such as had been altered after the formation of our constitution, "of these the court must judge."

In *Glasgow's Lessee* v. *Smith & Blackwell,* 1 Tenn. (Overt.), 144, 154, 155, it is said:

"With respect to what part of the statutes of England, to use the language of this act (Act of 1778, su-

pra), 'were heretofore in force and use,' no satisfactory opinion can be given; but the alternative of this sentence is susceptible of specification.    The expressions are, 'or so much of the said statutes, etc., as are not destructive of, repugnant to, or inconsistent with the freedom and independence of this State and the form of government.'   In other words, all the statutes of England contemplated in this act are in force which are not inconsistent with the principles and the form of the government.    The statutes contemplated by the act were those  .   .   .   passed previously to the fourth year of James I, when the charter of the colony of Virginia was granted, which included what was afterwards called North Carolina.''

To these should be added statutes passed afterwards up to the Revolution, when the colonies were specially named.    *Shute* v. *Harder,* 1 Yerg. (9 Tenn.), 5 to 8, 24 Am. Dec., 427.   In a note appended by Mr. Justice Cooper, formerly a member of this court, to the case of *Glasgow's Lessee* v. *Smith & Blackwell,* supra, we are furnished with a list of English statutes which have been held in force in this State.   1 Tenn. (Coop. Ed.), 169.   In the case of *State* v. *Miller,* supra, the opinion is expressed by Mr. Justice Freeman *arguendo* that our Code of 1858 repealed all English statutes previously in force here, as well as all prior acts of our own legislature, and that of North Carolina, with certain exceptions stated in section 41, of that body of laws.   It is unnecessary to deal with the proposition here as to the English statutes, because the learned

justice conceded that although the English statutes were thus repealed as statutes, yet the rules or principles contained in them remained as principles of our common law. What was said in *Box* v. *Lanier,* 112 Tenn., 393, 417, 79 S. W., 1042, 64 L. R. A., 458, by Mr. Chief Justice Beard, on the same subject, in approving *State* v. *Miller,* must be understood with the same qualification set down in the case last named. Of course, where the Code contains anything contrary to a common-law rule, whether expressed in an ancient act of Parliament or in the decision of a court or judge, the Code provision prevails.

The common-law rule as to Sunday has been expressly recognized in this State in the case of *Styles* v. *Harrison,* 15 Pick. (99 Tenn.), 128, 41 S. W., 333, 63 Am. St. Rep., 844, in which a judgment against Styles, fixing a fine upon him, and purporting to authorize his confinement in the workhouse, was held void because rendered on Sunday. Moreover, the unbroken custom of this State for more than 100 years, setting apart and treating Sunday as a nonjudicial day, would establish its character as such, as a part of the common law of this State, even apart from and in the absence of the decisions referred to:

"If a question arise concerning the existence of a general custom, it is to be tried by the justices, because every general custom is a part of the common law." 9 Bac. Abridg., 551; Bro. Trial, pl., 143; Mod., 573.

We have no statutes changing the common-law rule, except as indicated below.

To make this clear, it is necessary that we briefly set forth the early statutes of North Carolina and of this State forbidding the pursuit of common avocations on Sunday, and the service of process on that day, and the provisions of our Code thereon.

The North Carolina Act ·of the year 1741 (chapter 14, sec. 2) reads:

"That all and every person and persons whatsoever shall, on the Lord's day, commonly called Sunday, carefully apply themselves to the duties of religion and piety; and that no tradesman, artificer,. planter, laborer, or other person whatsoever, shall, upon the land or water, do or exercise any labor, business,· or work of their ordinary callings (works of necessity and charity only excepted), nor employ themselves either in hunting, fishing or fowling, nor use any game, sport, or play, on the Lord's day aforesaid, or any part thereof, upon pain that every person so offending, being of the age of fourteen years and upwards, shall forfeit and pay the sum of ten shillings proclamation money."

The foregoing provisions were subsequently re-enacted in 1803 (chapter 47), and were later carried into our Code in section 1723 (Sh., sec. 3029), and section 1724 (Sh., sec. 3031), except the injunction to "apply themselves to the duties of religion and piety."

The North Carolina act on the subject of executing process on Sunday was Acts 1777, ch. 8, sec. 6:

"It shall not be lawful for any sheriff, or other officer, to execute any writ or other process upon a Sunday, or upon any person attending his duty at a

muster of the militia, or any election,  .  .  .  or any person summoned to attend as a witness, or a juror; and all such service of process is hereby declared illegal and void, unless the same be issued against any person or persons for treason, felony, riot, rescous, breach of the peace, or upon an escape out of prison or custody, and such process shall be executed at any time or place." Nich. & Car., p. 665.

This was reproduced in our Code, section 2902 (Sh., sec. 4623), to this extent:

"Actions may be abated by plea of the defendant in the following cases: (1) Where process is issued or served on Sunday, except in the cases prescribed in sections 4529 to 4533."

The sections last cited forbid the issuance of civil process on Sunday, except in certain specified cases.

Criminal process:

"Any process, warrant or precept authorized to be issued by any of the judges, justices of the peace, or clerks of the court in any criminal prosecution in behalf of the State may be issued at any time and made returnable at any day of the term." Code, sec. 5031 (Sh., sec. 6991).

Section 5033 (Sh., sec. 6993):

"Arrests by officers for public offenses may be made on any day at any time."

Section 5034 (Sh., sec. 6994):

"Arrests by private persons for felonies may be made on any day and at any time."

Section 4128 (Sh., sec. 5940):

Moss v. State.

"He [a justice of the peace] is authorized, however, to try any cause that may be brought before him at any time, and at any place, within the county, unless expressly prohibited by some positive provision of this Code."

This language is perhaps sufficiently broad to enable a justice of the peace to try a case on Sunday, at least a criminal case; but we are not sure of this. As the question does not arise in the present case, we do not determine it. However, if this language does not give the authority there is nothing in our Code giving any authority to any judicial officer to try a case on Sunday. Certain it is there is no authority to justify any judicial officer higher than a justice of the peace to perform an act of the kind. It may be that the preservation of the public peace would sometimes require justices of the peace to try and commit persons brought before them on Sunday; but, as stated, as to all other judicial officers the common law remains practically unchanged by our Code and statutes.

We are referred, by the learned assistant attorney-general in his brief, to sundry cases wherein it is held that a verdict may be lawfully rendered on Sunday. The decided weight of authority seems to favor this contention. Some of the cases place this rule on the ground that the reception of a verdict is merely a ministerial act, and others on the ground that it is a work of necessity or charity in the way of relieving the jury from confinement, and permitting them to go their

way and employ Sunday in such manner as may seem to them enjoyable or beneficial. *City of Parsons* v. *Lindsay,* 41 Kan., 336, 21 Pac., 227, 3 L. R. A., 658, and note, 13 Am. St. Rep., 290; *Henderson* v. *Reynolds,* 84 Ga., 159, 10 S. E., 734, 7 L. R. A., 327, and note; *State of Louisiana* v. *Keatine,* 130 La., 434, 58 South., 139, 39 L. R. A. (N. S.), 844, and note.

The great weight of authority, however, is that a judgment cannot be rendered on Sunday, nor any judicial act performed thereon.

Charging the jury is a high judicial function, and it cannot be lawfully exercised on Sunday.

We so determine, not only in obedience to law, but with deep satisfaction as well, since Sunday is one of the most useful institutions we possess. Aside from its religious aspects, it is a noble police regulation, greatly tending to preserve and increase the public health, affording as it does a stated time of rest from labor, and a means of physical and mental recuperation. On those who also regard and use it as a religious institution it bestows an additional benefit. When the laws protecting this institution are disregarded by our trial judges, we can only reverse their jugdments, and remand their cases for another trial, and that course will be followed in the present case.

Such action on the part of the trial judge does not fall within the protection of Acts 1911, ch. 32, concerning the duty of appellate courts to overlook mere irregularities and technical objections. To hold court

Moss v. State.

on a day not permitted by law is as fatal as performing the same act at a place other than that prescribed by law.

Reverse and remand.