| 64 | 243 |
| 136 | 205 |
| 64 | 243 |
| 145 | 619 |
| 64 | 243 |
| 69a | 512 |

JAMES LANGABIER

*v.*

THE FAIRBURY, PONTIAC AND NORTHWESTERN R. R. Co.

SUNDAY—*of judicial proceeding on such day—whether valid.* A writ of injunction may lawfully issue on a Sunday, when, to prevent irreparable injury to property, an imperious necessity demands the prompt interposition of chancery.*

*See act of March 25, 1874, Gross'.Stat. vol. 3, p. 236; Rev. Stat. 1874, p. 581, giving the power to issue an injunction on Sunday.

.WRIT OF ERROR to the Circuit Court of Livingston county; the Hon. CHARLES H. WOOD, Judge, presiding.

Mr. A. E. HARDING and Mr. J. B. YOUNG, for the plaintiff in error.

Messrs. PILLSBURY & LAWRENCE, and Mr. L. E. PAYSON, for the defendant in error.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was a bill in chancery, in the Livingston circuit court, praying for a writ of injunction to restrain the Fairbury, Pontiac and Northwestern Railway Company from taking possession of one of the principal streets (Walnut) in the incorporated town of Fairbury, for the purpose of grading, tieing and ironing the same for the track of their railroad.

The bill is filed by a large property owner on the street to be taken by the railway, and it alleges that the company, immediately after twelve o'clock of the night of Saturday, with a large force of men, had taken violent possession of the street for the express and avowed purpose of finishing their track through its entire length before the next Monday morning; and that they had selected Sunday for the work, for the express purpose of evading an injunction, and avoiding the process of court, and for the purpose of obtaining and holding the street without paying for it or the damages thereby occasioned to the property owners upon it; that the company has not paid or offered to pay anything to any person injured by the proposed occupancy of that street, nor taken any steps or measures to estimate the damages or have the same assessed in pursuance of law.

It is also alleged that the company is wholly insolvent, and if it is permitted to take possession, control and use that street, for the purpose of operating their trains over the same, without paying complainant the damages he will sustain in consequence thereof, he will be without remedy in the premises,

and will absolutely lose at least one-half the value of his property in consequence thereof, and that the grading for railway purposes will greatly injure the street and complainant's property; and unless the company, the contractors and their agents and servants are restrained by injunction issued forthwith, the road will be finished through the street to-day, Sunday; and that the company and its contractors are doing the work on this day—Sunday—in order to avoid paying complainant his damages, and to defraud him out of the same, which they will accomplish successfully unless immediately enjoined by process of the court.

This bill was presented to the master in chancery, in the absence of the circuit judge, on Sunday. The writ of injunction was ordered by the master on that day, and issued by the clerk and served by the sheriff on the same day.

At the September term following, a motion was made to quash the writ, which was allowed, and the bill dismissed.

Complainant brings the record here by writ of error, and assigns this action of the court as error.

The bill, on its face, presents strong grounds for the interference of a court of chancery, and justified the ordering and issuing a writ of injunction. But the defendant insists, if this be so, no valid writ could issue on Sunday. He insists that the order of the master in chancery, being made on Sunday, was void, for the reason it was a judicial act, and Sunday is not a judicial day.

As a general proposition, it may be conceded Sunday is not a day in law for proceedings, contracts, etc. 2 Inst. 264.

Anciently, however, courts of justice did sit on Sunday. The early Christians of the sixth century, and before, used all days alike for hearing of causes, not sparing the Sunday itself; but in the year 517 a canon was promulgated exempting Sundays. Other canons were adopted in subsequent years exempting other days, which were all revised and adopted by the Saxon kings, and all confirmed by William the Conquerer and Henry the Second, and in that way became a part of the common law of England. *Swann* v. *Broome,* 3 Burrow, 1595.

246 LANGABIER *v.* F., P. & N. W. R. R. Co. [Sept. T.,

Opinion of the Court.

By the canons of the church, Sunday was decreed *dies non juridicus*, and by the same canons other days were declared unjuridical, as the day of the Purification of the Blessed Virgin Mary, the Feast of the Ascension, the Feast of St. John the Baptist, and All Saints and All Souls Days. These were as much unjuridical days as Sunday, yet the most devoted admirer of the common law would not hesitate to say that the proceedings of a court of justice in this State on either of those days would be valid. Yet, by the common law, no valid judicial act could be performed on either of those days. Why, then, if such an act can be done, and have binding force, on those unjuridical days in this State, should not equal efficacy be accorded to the same act, if done on the other unjuridical day, viz: Sunday?

It is answered, that secular employment of any kind is prohibited by our criminal code, and reference is made to section 144.

We had occasion, in *Johnson* v. *The People*, 31 Ill. 469, to express, briefly, our views of this question, the case being one where a recognizance had been taken by a magistrate on Sunday, from which the cognizor sought to be discharged, on the ground that, having been taken on Sunday, and being a judicial act, it was void and of no effect. This court said, generally judicial acts can not be performed on Sunday, but the recognizance was held to be valid, and no violation of the section referred to; that we were to understand by the word "necessity," not a physical and absolute necessity, but the moral fitness and propriety of the work done under the circumstances of each particular case—that any work, therefore, necessary to be done to secure the public safety by the safekeeping of a felon, or delivering him to bail, must come within the true meaning of the exception in the statute; that neither the peace nor good order of society was disturbed by such a proceeding, as it may be, and usually is, silently conducted.

The notion that Sunday is a day so sacred that no judicial act can be performed, had its origin with ecclesiastics of an unenlightened age, and rests upon no substantial basis, and if it is the doctrine of the common law, it need not have application here, in this day of thought and increased enlightenment. Men are freeer now than then, and are permitted to regard acts as innocent and harmless, which were then deemed sacreligious and worthy of anathema. So long as our own statute is not violated—so long as nothing is done which it forbids, there can be no reasonable ground for complaint.

There is nothing in our constitution of government inhibiting the general assembly from declaring Sunday to be *dies juridicus.* One step has been taken in that direction by providing by law, as follows: On proof being made before any judge or justice of the peace or clerk of the circuit court within this State, that a debtor is actually absconding, or concealed, or stands in defiance of an officer duly authorized to arrest him on civil process, or has departed this State with the intention of having his effects and personal estate removed out of the State, or intends to depart with such intention, it shall be lawful for the clerk to issue, and the sheriff or other officer to serve an attachment against such debtor on a Sunday, as on any other day, as is directed in this chapter. R. S. 1845, ch. 9, sec. 27.

Here, this *dies non juridicus* was selected by the railway company as the proper day to commit a great outrage upon private and public rights, believing the arm of the law could not be extended on that day to arrest them in their high-handed and unlawful design. To the complainant the acts they were organized to perpetrate on that day were fraught with irreparable injury. Feeble indeed would be the judicial arm if it could not reach such miscreants.

To save a debt of twenty dollars, judicial acts can be performed on Sunday, and maintained as well. To prevent the ruin of an individual, such an act must not be done! "Lame and impotent conclusion."

In Comyn's Digest, title "Temps," under the head, *Dies non juridicus,* it is said, the chancery is always open. So the Exchequer may sit upon a Sunday or out of term. P. 333 (C. 5). There is nothing, to an intelligent mind, revolting in this.

Suppose, in times of high political excitement, a citizen is indicted for treason, and judgment of death pronounced against him by a servile judge, who, not a slave of the Crown, as were Tressilian, Scroggs and Jefferies, but yet the slave of an enraged populace, on an indictment never returned into court, or found by a grand jury, and defective in every essential, and this judgment pronounced on Saturday, and the time of his execution fixed on the following Monday. To arrest this proposed judicial murder, an application is made to a member of the appellate court on the intervening Sabbath : who would justify the judge, should he fold his arms and, on the plea the day was not a judicial day, suffer the victim to be led to execution ?

The necessity of the case would be the law of the case. The judge who has no respect for this principle, is unworthy the ermine and an unfit conservator of the rights of the citizen.

The case before us is not one of life or death, but it involves irreparable injury to property. An imperious necessity demanded the prompt interposition of chancery. On that principle the act is fully justified. This is the dictate of right, of reason, of common justice and common sense.

The decree of the court below quashing the writ of injunction and dismissing the bill is reversed, and the cause remanded for further proceedings.

*Decree reversed.*