The State of Ohio, Appellee, *v.* McElhinney, Appellant.

(No. 326—Decided April 4, 1950.)

*Mr. Clyde E. Lewis,* prosecuting attorney, for appellee.

*Mr. Fred R. Wickham,* for appellant.

Putnam, J.  This is an appeal on questions of law from a judgment of the Court of Common Pleas of Delaware County, affirming a judgment of a justice of the peace overruling a motion for a new trial, based solely on the ground that the arrest, plea of guilty and sentence of the defendant on a misdemeanor charge took place on Sunday, October 17, 1948.

The assignment of error is as follows:

"The court erred in affirming the judgment of the justice of the peace for Delaware township, Delaware county, Ohio, wherein said justice overruled the motion of the defendant-appellant for a new trial and adhered to his judgment accepting defendant's plea and sentencing him on Sunday, October 17, 1948."

It is not contended that these proceedings were against the will and over the objection of the defendant, and it is admitted in argument that he desired quick action until the terms of a heavy sentence made the procurement of counsel and challenging action desirable.

The sole question involved is whether the courts of Ohio may take judicial action on Sunday. It is admitted that there is no statutory law in this state prohibiting courts from functioning on Sunday; and that the Sunday laws which we have, such as prohibiting common labor on Sunday, do not include judicial acts.

The contention is that under the common law of England Sunday is a nonjudicial day or *dies non juridicus* and as such all judgments pronounced by courts on that day are void; that this principle of the common law is the law of Ohio; and that if this is not so the appeal has no merit.

It is alleged that there are no decisions by our Supreme Court directly in point binding upon this court. This perhaps is true except as certain of the decisions hereinafter referred to contain statements of principle and arguments which are true and persuasive. Many decisions are cited from other states holding that judicial acts on Sunday are void. Many of these are based upon specific statutory enactment. In some states, it is true, the decisions are based squarely upon the common law.

Exhaustive and helpful briefs have been filed by

counsel herein and numerous authorities cited from texts and other states as well as our own. It would serve no useful purpose to enter into a detailed analysis of these cases as, in our opinion, two or three Ohio cases are decisive of the question herein presented, not because they are in direct point, but because the principles and arguments therein expounded are pertinent and persuasive and are arrows that point the way which ought to be followed.

In the case of *Bloom v. Richards,* 2 Ohio St., 387, it was held that a contract entered into on Sunday was not for that reason void at common law. However, in the statement of principles therein the following appears:

"But even were such a contract void by the common law of England, it would not necessarily follow that it is void in Ohio.

"The English common law, so far as it is reasonable in itself, suitable to the condition and business of our people, and consistent with the letter and spirit of our federal and state constitutions and statutes, has been and is followed by our courts, and may be said to constitute a part of the common law of Ohio. But wherever it has been found wanting in either of these requisites, our courts have not hesitated to modify it to suit our circumstances, or, if necessary, wholly to depart from it.

"Christianity is a part of the common law of England, but, under the provisions of our Constitution, neither Christianity nor any other system of religion is a part of the law of this state.

"We have no union of church and state, nor has our government ever been vested with authority to enforce any religious observance simply because it is religious. Of course, it is no objection, but, on the contrary, it is a high recommendation to a legislative enactment,

based upon justice or public policy, that is found to coincide with the precepts of a pure religion; nevertheless, the power to make the law rests in the legislative control over things temporal, and not over things spiritual.

"The statute, prohibiting common labor on the Sabbath, could not stand for a moment as the law of this state, if its sole foundation was the Christian duty of keeping that day holy, and its sole motive to enforce the observance of that duty. It is to be regarded as a mere municipal or police regulation, whose validity is neither strengthened nor weakened by the fact that the day of rest it enjoins is the Sabbath day."

The case of State v. Thomas, 61 Ohio St., 444, 56 N. E., 276, 48 L. R. A., 459, involved the question, among others, whether a conviction based upon an indictment returned by a grand jury which was impanelled and sworn on Labor Day is invalid. Labor Day is designated by statute as a holiday "and for all purposes whatever considered as the first day of the week." The second paragraph of the syllabus of that case is as follows:

"Construing Section 457 of the Revised Statutes, with Section 4446-2, which makes the first Monday in September a holiday to be known as Labor Day, it is not unlawful to hold the Court of Common Pleas on that day when the judges of the district in the exercise of their powers under the first of these sections have fixed that day for the commencement of the term; and an indictment found and returned by a grand jury impanelled and sworn in on that day is not, on that account, invalid."

In the course of the opinion, at pages 465 and 466, the court states:

"If it be conceded that the statute places Labor Day in the same category with Sunday for all purposes,

does it follow that a grand jury impanelled on that day is an illegal body without authority to thereafter hear evidence and find indictments? The distinctive principle established by the case of *Bloom* v. *Richards,* 2 Ohio St., 387, is, that Sunday laws are mere civil regulations for the good of society, and not designed to enforce or require any religious observance of the day; and, that being penal in their nature, such laws will not be extended by construction beyond their plain import; so that, whatever act may be lawfully done on any other day of the week, is equally lawful on Sunday, unless its performance on that day is forbidden by statute. Our statute goes no further than to the prohibition, on that day, of common labor, the arrest of persons on civil process, the selling of intoxicating liquors, and certain shows, games and sports. It was held in that case that the making of a contract for the sale of land did not come within the prohibition against common labor on Sunday, and the specific performance of such a contract made on that day was enforced. The case was thoroughly considered, and it is shown by Judge Thurman, in an opinion of great research, that the principles stated are maintained by the great weight of authority in this country, and that under constitutions like ours, an enactment could not be sustained whose purpose was simply to enforce the observance of Sunday as a religious duty. It is generally held that statutes which in terms require the closing of public offices on Sunday, do not prevent the performance of judicial duties by judges on that day. There is no provision in our statutes, as there is in those of many of the states, and was in 29 Car., 2 C. 7, under which most of the English decisions on the subject were made, forbidding the holding of courts, or judicial proceedings on Sundays, or holidays, or requiring public offices to be closed, or all secular busi-

ness suspended on that day; and the omission of such provisions from our statutes, in view of their presence in the statutes of other states, and especially since the decision of *Bloom* v. *Richards, supra,* which has been accepted as the law of this state for nearly half a century, leads to the conclusion that the Legislature has not deemed it advisable to incorporate either of them into the laws of the state. Certain, it is, that neither of them is embraced in the term common labor, as used in our statute. Where the transaction of judicial business on Sunday or holidays is expressly forbidden by statute, acts of a ministerial character on those days are held lawful; such as the issue of a warrant for the apprehension of a criminal and his admission to bail, the receiving of a verdict and committing the defendant for sentence, the issue and service of civil process, and many other acts of a similar nature. *All of which is a recognition of the rule already stated, that whatever acts may be lawfully done on other days are also lawful when performed on Sunday or a holiday, except when, and in so far as their performance on those days is prohibited by statute.* * * * Our attention has been called to the case of *Spiedel Grocery Co.* v. *Armstrong,* 8 C. C. R., 489, where it is held that a judgment rendered on Labor Day was void. That case was affirmed by this court without report, and was not much considered. The correctness of the decision may well be doubted; but it is not necessary to reconsider it here." (Emphasis added.)

The authorities agree that historically under the early common law of England courts were authorized to and did sit on Sunday, the same as on other days of the week.

In order to properly assay appellant's claim that that portion of the common law of England which makes Sunday a nonjudicial day is now a part of the

common law of Ohio, it is necessary to keep in mind the historical background.

Professor Wigmore in his work, a Panorama of the Worlds Legal Systems (1936 Ed.), in giving an account of the papal or canon legal system, at page 935 states:

"The Bishop of Rome was early recognized as the successor of Saint Peter, whose bronze statue stands in the Vatican. That Bishop under Latin Christianity was given the title of Pontifex Maximus, a title already familiar in the pagan priesthood. And, in the course of time, the successor of Saint Peter, began to claim universal jurisdiction of law, not only over the Christian Church, but also over temporal kings and princes. The typical expression of this claim is found in a supposed letter of Pope Clement I, A. D. 91 addressed to the clergy, and later included in the so-called Decretals of Isidore, the vital Clauses read:

" 'Your duty is to teach the peoples. Their duty is to obey you as they would God Himself. . . . .And all princes, high or low, and other peoples, tribes, and languages, who do not obey shall be infamous, and shall be cast out from the kingdom of God and the company of the faithful.'

"These words described during some centuries the dominance of the church's supreme jurisdiction over morals and faith. This quasi-federal jurisdiction of the church had its own tribunals (like the American federal ones) for its own special field, alongside the other courts; but it claimed and received a supreme appellate political jurisdiction over all temporal kings and kingdoms, with the Pope as Pontifex Maximus, judging all men, and judged by none.

"From Serbia on the east to Iceland and Greenland on the northwest extended the jurisdiction of this theocracy. Its sway was at the zenith in the centuries

A. D. 800-1200; it ended by four hundred years later, and it had begun four hundred years earlier,—twelve centuries in all.''

From the same source we learn that in 1140 A. D. the legislation and decisions of the Popes were first systematically digested by a monk named Gratian in the so-called Decretum of Gratian. The author states, at page 944:

''Twice in history the growth of the papal supreme jurisdiction received a powerful impulse from literature; the first impulse was given by the forged Decretals of Isidore, in the 800's, already mentioned; and now it took place a second time, in this Decretum —one of those great text-books which by appearing at just the right time and the right place, become universally revered as equal to law.''

As will be noted later, these periods coincide approximately with the reigns in England of Alfred and Henry II and Edward the Confessor. The power of the ecclesiastical courts and the dominance of canon law reached its peak, perhaps, during the Pontificate of Pope Innocent III, who died in 1216 A. D.

Professor Wigmore states at page 954:

''But in Innocent's day the Roman church was vastly more than that; it claimed and possessed supreme temporal political power over the entire Christian world. Rome was once more the mistress of Europe, and kings were its vassals. Its clergy were immune from the criminal justice of the state. Its legislation covered the whole of human existence from the cradle to the grave; it was upheld by penalties that neither the proudest monarch nor the humblest peasant could escape; and it was administered by a supreme world-judge responsible to no earthly superior for his actions.''

And on page 953 states: ''Innocent III was the am-

bitious and masterful autocrat who humbled the English King John for signing Magna Carta, and who reduced England, for a short period, to be only a vassal of the papacy * * *."

Such was the atmosphere at the time in which it is stated in *Swann* v. *Broome*, 3 Burrows, 1595, that these canons were adopted by the Saxon kings, fortified by Edward the Confessor and confirmed by William the Conqueror and Henry II.

The original Celtic population of Britain was pagan, and its religion and legal system were administered by the priestly Druids. These were practically exterminated upon the conquest of Britain by Caesar at the middle of the first century A. D. For 400 years thereafter Roman law was administered in England by Roman praetors. Upon the abandonment of Britain by the Romans in the fifth century, Celtic culture had a short resurgence but very soon the pagan Angles, Saxons and Jutes invaded England and for 300 years dominated the scene. Eventually they established seven petty kingdoms known as the Heptarchy, all with fluctuating boundaries. It was not until 827 A. D. that these become consolidated under Edgbert King of Wessex who became Britwalde of the Saxon States. However, during the Pontificate of Pope Gregory the Great, 590 to 604 A. D. forty missionaries were sent to Britain and Ethelbert King of Kent and many of his subjects were converted. This was the first serious attempt to christianize the Anglo-Saxons.

Historically, the origin of the canon law of the church which made Sunday *dies non juridicus* is supposed to be in an edict of the Roman Emperor Constantine about the time he convened the counsul of Nicea, in 325 A. D., in an attempt to unify the Christian Church. Neverthless, in the year 517 A. D. a canon

was adopted by the church which made not only Sunday but many other holy days *dies non juridicus.* These were enforced throughout the Christian world as above noted and were included in the Decretals of Gratian. They were designated as such days "to the intent that all people may apply themselves on that day to prayer and serving God."

It is thus quite apparent that this law was church law and its purpose was to enforce a religious duty. It did not originate in England; it was brought there from Rome. It did not have universal application but at first was applied only under a few Saxon kings. The majority were pagan. The Danes who started their invasions of England about 830 A. D. were also pagan and for 200 years, in their wars with the Saxons, they occupied and held much of northern and eastern England, where ecclesiastical law was not recognized. However, when William Duke of Normandy invaded and conquered England in 1066 under the benediction of the Church of Rome, and for 200 years thereafter, while the common law was being consolidated, the church exercised a predominant influence over the English monarchs.

During the reign of Henry VIII in the 16th century and prior to his break with the Roman Church, for services to the church he was styled "defender of the faith." And even though he broke with Rome and established the Church of England, British Kings, among other titles, are still "defenders of the faith." It is thus apparent that the statement that Christianity is a part of the common law of England is fully justified. However, it does not follow from that premise that that part of the common law is the law of Ohio. As stated in *Bloom* v. *Richards, supra*:

"* * * under the provisions of our Constitution, neither Christianity nor any other system of religion is a part of the law of this state.

"We have no union of church and state, nor has our government ever been vested with authority to enforce any religious observance simply because it is religious."

This statement is borne out by the writings of Thomas Jefferson as quoted in Scott's Evolution of the Law (1908 Ed.). We find the following at page 148:

"Tracing it [ancient writings] down through the law books, he [Jefferson] finds where Sir Matthew Hale states that 'Christianity is parcel of the laws of England,' and that Lord Mansfield has just decided that the 'essential principles of revealed religion are a part of the common law' which carried the doctrine still further, and as Jefferson observes: 'Leaving us to find out, at our peril, what in the opinion of the judge and according to the measure of his foot or faith, are those essential principles of revealed religion obligatory on us as a part of the common law.'

"* * * and he significantly adds in his note-book where this record appears that because Christianity is true, it does not become a part of the common law; that the Newtonian law is true, but no part of the common law."

Certainly no matter what the English may consider as a part of their common law, only so much thereof as is applicable to our government do we adopt. The church and state are still united in England. They were severed in this country by the revolution. Jefferson no doubt wrote with the early history of Virginia in mind. History records and it is lucidly recounted in Freeman's "George Washington" how the tenants of the early proprietors in Virginia were not only required to pay quit rents but were taxed by the government for the support of the established church (Church of England), and how other settlers, especial-

ly the Germans from Pennsylvania who settled in the Shenandoah valley and upper reaches of the Potomac, objected violently to this tax. The various colonies had decidedly different views on religion, and in the compromises which resulted in the adoption of the federal Constitution, it is not to be wondered that a complete severance of the church and state was recognized by the terms thereof. Undoubtedly the views of Jefferson had weight in the results reached.

The few opinions cited in briefs of counsel which are grounded squarely upon the common law fail to take into consideration these historical facts. It is to be observed that in the great majority of opinions in the cases cited, the conclusions are not based upon the common law but upon specific statutory enactment. In this category are Pennsylvania, North Carolina, New York, Oklahoma, New Jersey, Nebraska and possibly Tennessee and Kansas.

In the case of *Moss* v. *State,* 131 Tenn., 94, 173 S. W., 859, while the common-law rule is recognized and adhered to, the basis of the decision is statutory. The discussions in that case are interesting but its conclusions cannot be applied to Ohio for several reasons, viz:

(a) The decision is based on several grounds, one of which is the common law of Tennessee. The court says: "Moreover the unbroken custom of this state for more than 100 years setting apart and treating Sunday as a nonjudicial day, would establish its character as such, as a part of the common law of this state, even apart from and in the absence of the decisions referred to." We have no such common law in Ohio.

(b) The opinion further states in substance that the common law of England, as it stood at and before the separation of the colonies, is the law of Tennessee,

being derived from North Carolina out of which the state of Tennessee was carved, and this is made so by statute. They are derived from Virginia which included North Carolina and embraced the common law prior to the fourth year of James I.

The laws of Ohio have no such derivation.

While Texas, Missouri and Nevada seem to adhere to the common-law rule, we cannot agree that these cases constitute the great weight of authority as claimed by the appellant. In Louisiana the courts refuse to follow the common-law rule. In the case of *State* v. *Brownfield,* 160 La., 171, 106 So., 734, 43 A. L. R., 475, in following a previous case, the court said:

"And in that case [*State* v. *Foss,* 158 La., 471, 104 So., 211] the court held that there is no legal principle which forbids an accused party from consenting to have his case argued, submitted and determined on Sunday or a statutory legal holiday."

In the case of *Langabier* v. *Fairbury, Pontiac & Northwestern Rd. Co.,* 64 Ill., 243, 16 Am. Rep., 550, which involved the validity of an injunction issued on Sunday against a railroad company which had taken possession of a street after 12 o'clock on a Saturday night with the intention of finishing a track through the entire length of the street before Monday morning, counting upon the intervening *dies non juridicus* by which to evade an injunction and the process of court, the court in upholding the validity of the injunction stated:

"Here, this *dies non juridicus* was selected by the railway company as the proper day to commit a great outrage upon private and public rights, believing the arm of the law could not be extended on that day to arrest them in their highhanded and unlawful design. To the complainant the acts they were organized to perpetrate on that day were fraught with irreparable

injury. Feeble indeed would be the judicial arm if it could not reach such miscreants.

"To save a debt of twenty dollars, judicial acts can be performed on Sunday, and maintained as well. To prevent the ruin of an individual, such an act must not be done! 'Lame and impotent conclusion.'

"In Comyn's Digest, title 'Temps,' under the head, Dies non Juridicus, it is said, the chancery is always open. So the Exchequer may sit upon a Sunday or out of term. P. 333 (C. 5). There is nothing, to an intelligent mind, revolting in this.

"Suppose, in times of high political excitement, a citizen is indicted for treason, and judgment of death pronounced against him by a servile judge, who, not a slave of the Crown, as were Tressilian, Scroggs and Jeffries, but yet the slave of an enraged populace, on an indictment never returned into court, or found by a grand jury, and defective in every essential, and this judgment pronounced on Saturday, and the time of its execution fixed on the following Monday. To arrest this proposed judicial murder, an application is made to a member of the appellate court on the intervening Sabbath: who would justify the judge, should he fold his arms and, on the plea the day was not a judicial day, suffer the victim to be led to execution?

"The necessity of the case would be the law of the case. The judge who has no respect for this principle, is unworthy the ermine and an unfit conservator of the rights of the citizen.

"The case before us is not one of life or death, but it involves irreparable injury to property. An imperious necessity demanded the prompt interposition of chancery. On that principle the act is fully justified. This is the dictate of right, of reason, of common justice and common sense."

While that was a chancery case and not strictly in

point, yet the reasoning therein is certainly cogent in showing that there should be no construction of the law which would render a judicial act on Sunday as absolutely void.

From all the above considerations it is our judgment that the common law of England making Sunday a *dies non juridicus* is not a part of the common law of Ohio. Nor is it a part of the common law of Ohio from usage in this state, since for almost 100 years our highest court has pronounced the contrary doctrine. There being no statute in Ohio expressly prohibiting judicial acts on Sunday, it follows that the proceedings before the justice of the peace in this case were not void.

However, in coming to this conclusion we do not hold that judicial proceedings on Sunday may not be voidable as constituting an abuse of discretion on the part of the trial court. Certain judicial acts may be necessary, justifiable and legal, but on the other hand, a full functioning of a court in the trial of a jury case involving the heating of the courthouse, the attendance of the bailiff, clerk, jurors and witnesses, the labor of a janitor, and the manifold activities of such proceeding might well not only violate the provisions of existing statutes against the performance of common labor on Sunday, but also so outrage the customs of a community as to constitute an abuse of discretion which would warrant a vacation of the proceedings. However, that is not the instant case.

In the instant case it is worthy to note here that under any theory of the case the great weight of authority is, even in those states which hold Sunday to be a *dies non juridicus,* that the receiving of a verdict on Sunday is proper as being a ministerial act only. It can scarcely be maintained that there is any difference in nature between the receiving of a verdict and the receiving of a plea of guilty or not guilty. Conse-

quently, in any view of the case favorable to the appellee, the most that could be done would be to remand the defendant for resentence.

However, it is the judgment of this court, for the reasons stated, that the arrest, arraignment, plea and sentence were not void; nor under the circumstances was there any such abuse of discretion on the part of the trial court as to warrant this court in setting the same aside. It is true that the sentence is heavy, but it is within the limits prescribed by statute and therefore lawful and this court is not justified in interfering therewith.

The judgment of the lower court must be and hereby is affirmed.

*Judgment affirmed.*

MONTGOMERY, P. J., and MCCLINTOCK, J., concur.