**Danny Ray HARRIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68900.**

Court of Criminal Appeals of Texas, En Banc.

Feb. 9, 1983.

Lamar Hankins, William W. Vance, Bryan, for appellant.

Travis B. Bryan, III, Dist. Atty., Bryan, Anita Ashton, Sp. Asst. Dist. Atty., Austin, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Before us for automatic review, mandated by Article 37.071(f), V.A.C.C.P., is a conviction for capital murder under V.T.C.A. Penal Code, § 19.03(a)(2) and sentence of death assessed pursuant to Article 37.071(e), V.A.C.C.P. The victim was a motorist who had stopped to help appellant and his three companions, stranded outside Bryan. One of those companions, James Charles Manuel, appellant's codefendant, was convicted of capital murder and received a sentence

of life imprisonment. Another, Curtis Paul Harris, appellant's brother, was tried separately, was convicted of capital murder, and a death sentence was assessed. His conviction was reversed by the Court, and the cause was remanded. *Harris v. State,* 642 S.W.2d 471 (Tex.Cr.App.1982). The remaining companion, Valarie Rencher, a juvenile at the time, testified for the State at both trials.

▮ Appellant contends the action of the trial court in delivering *on a Sunday* the charge to the jury on punishment was an error requiring reversal. He relies upon *Guerrera v. State,* 136 Tex.Cr.R. 411, 125 S.W.2d 595 (1939), which cites *Moss v. State,* 131 Tenn. 94, 173 S.W. 859 for the rule that a court may not perform a judicial act on Sunday.

*Dies dominicus non est juridicus.*[1] The dictum originated as a canon of early Christianity—first made in 517 A.D. *Swann v. Broome,* 3 Burrow 1595, 1598 (1764), 97 English Reports (King's Bench Book 26) 999, 1001. It and successor canons were received from Rome and adopted in Britain by Saxon Kings. *Ibid.* and *State v. McElhinney,* 88 Ohio App. 431, 100 N.E.2d 273, 278 (1950). In time those canons were transformed into constitutions by Edward the Confessor and, in turn, were confirmed by William the Conqueror and Henry the Second, and so became part of the common law of England. *Swann v. Broome, supra,* at 1598.

In the Declaration of Independence Texian revolutionaries made bitter charges against the religiosity of the military government of General Antonio Lopez de Santa Anna;[2] when they came to deliberate on a new constitution, representative delegates required Presidential consent before any person was "permitted to perform divine service in the chamber occupied by the [Constitutional] Convention;"[3] they strongly stated ineligibility of ministers and priests to certain public office;[4] and they included an insistent declaration of impartiality among religions and personal freedom of worship.[5]

The same attitude was prevalent when the Constitution of the State of Texas was adopted in 1845. See Article I, §§ 3[6] and 4[7] of Bill of Rights, and Article III, § 27.[8]

1. "Sunday is not a court day, or day for judicial proceedings, or legal purposes." Black's Law Dictionary (Revised Fourth Edition) 542.

2. Denounced was "a consolidated central military despotism, in which every interest is disregarded but that of the army and the priesthood, both the eternal enemies of civil liberty, the every-ready instruments of power, and the usual instruments of tyrants," The Declaration of Independence, 1 Gammel's Laws of Texas 1063. Another grievance was that freedom of worship had been denied "by the support of a national religion, calculated to promote the temporal interest of its human functionaries . . . ," *id.,* at 1065.

3. 1 Gammel's Laws, 833.

4. Article V, § 1 of the Constitution of the Republic of Texas provides:
 "Sec. 1. Ministers of the gospel being . . . dedicated to God and the care of souls, ought not to be diverted from the great duties of their functions; therefore, no minister of the gospel or priest of any denomination whatever, shall be eligible to the office of the executive of the republic, nor to a seat in either branch of the congress of the same."
 1 Gammel's Laws 1075.

5. The Third Declaration of Rights mandated:
 "No preference shall be given by law to any religious denomination or mode of worship over another, but every person shall be permitted to worship God according to the dictates of his own conscience."
 1 Gammel's Laws 1082.

6. "Sec. 3. No religious test shall ever be required as a qualification to any office or public trust in this State." 2 Gammel's Laws 1277.

7. "Sec. 4. All men have a natural and indefeasible right to worship God according to the dictates of their own consciences: no man shall be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; no human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion and no preference shall ever be given by law to any religious societies or mode of worship. But it shall be the duty of the Legislature to pass such laws as [may] shall be necessary to protect every religious denomination in the peaceable enjoyment of their own mode of worship." *Ibid.*

8. Once again ministers of the gospel and priests of every denomination were declared

See generally *Church v. Bullock,* 104 Tex. 1, 109 S.W. 115, 117–118 (1908).[9]

In a related vein also to be noted is that reasonably diligent research reveals that "Sunday laws" were not enacted until December 16, 1863, 5 Gammel's Laws 690–691, and neither that Act nor any successors are intended or designed to prohibit judicial "work" on the Sabbath. See, e.g., Act of November 13, 1866, *id.,* at 1137; Act of December 2, 1871, 7 Gammel's Laws 64; Chapter Two, P.C. 1925. Indeed, in *Shearman v. State,* 1 Tex.App. 215 (Ct.App.1876), the former court of appeals found they did not refer to proceedings in court; *Stephens v. Porter,* 29 Tex.Civ.App. 556, 69 S.W. 423 (1902, no writ history) held they did not apply to "an officer engaged in the performance of official duties," *id.,* at 424.[10] They have since been removed from the penal Code.[11]

Notwithstanding such strongly demonstrated antipathy to mixing affairs of government and religion and a shared secularism in matters of state, some scattered opinions of our courts suggest that the founders of Texas and framers of its constitutions imported into the jurisprudence by

way of the English common law that canon of religion which held Sunday is not a court day. However, the unique circumstances of and felt declarations surrounding the separation of Texians from the Mexican nation and establishment of form of government to their liking seem not to have been examined, nor has continued development of their constitution and laws been appreciated.

The Constitution of the Republic of Texas did indeed provide in Article IV, § 13:

> "The Congress shall, as early as practicable, introduce, *by statute,* the common law of England, with such modifications as our circumstances, in their judgment, may require; and in all criminal cases the common law shall be the *rule of decision.*"[12]

Conformably, the first Congress introduced the common law of England "in its application to juries and to evidence" into the practice of the courts "so far as the same may not be inconsistent with this act, or any other law passed by this congress." "An Act Organizing the Inferior Courts ...," § 41, 1 Gammel's Laws 1208, 1216–1217. By the Act of January 20, 1840, the Congress further provided in Section 1:

---

ineligible for the Legislature. *Id.,* at 1282–1283.

**9.** Also implicated in *Church v. Bullock,* supra, was Article I, § 7 of the Bill of Rights, first placed in our Constitution of 1876, *viz:*

"Sec. 7. No money shall be appropriated, or drawn from the Treasury for the benefit of any sect, or religious society, theological or religious seminary; nor shall property belonging to the State be appropriated for any such purposes."

Relatedly, Article VII, § 5 declared that the permanent school fund was never to be available for support of sectarian schools. With all these constitutional provisions in effect, the Interpretative Commentary following Article I, § 7 correctly perceives, "A wall of separation between church and state is created."

**10.** The court pointed out:

"There is no law in Texas prohibiting the commissioner of the general land office from

holding his office open on Sunday or any legal holiday, or from performing official acts on those days. Neither our constitution nor our civil statutes lay any such restrictions upon the governor nor upon any of the heads of the state departments, probably because it might sometimes be necessary for them to perform their official functions on those days."

**11.** 4 V.T.C.A. Penal Code Appendix 399, 454–455. The principal closing law is now Article 9001, V.A.C.S. See *Gibson Product Co., Inc. v. State,* 545 S.W.2d 128 (Tex.1976). However, it has been more realistically labelled a "Sunday opening law," by former Chief Justice Robert W. Calvert in *State v. Spartan's Industries, Inc.,* 447 S.W.2d 407, at 415 (Tex.1969).

**12.** All emphasis is added throughout by the writer of this opinion unless otherwise indicated.

" . . . That the Common Law of England (so far as it is not inconsistent with the Constitution or the Acts of Congress now in force) shall, together with such acts be the rule of decision in the Republic, and shall continue in full force until altered or repealed by Congress."

2 Gammel's Laws 177–178.

The following year the Supreme Court of Texas was called on to address the language of adoption in the Constitution and statutes. In *The Republic v. Smith,* Dallam's Digest 407 (1841), Dallam's Decisions 83, at 87–88, the Supreme Court concluded:

"But we cannot admit that in adopting the common law the convention intended thereby to adopt irrevocably the practice of the common law in criminal proceedings, and tie down the legislature of the country to the common law course in criminal proceedings: for we see that the very framers of the Constitution itself, after adopting the 'common law as the rule of decision in criminal proceedings,' have gone on and made considerable innovations in the practice of that very Code which they had just adopted. * * * It is our opinion, then, that the convention intended only to adopt the common law, to use their own language, 'as the rule of decision' in criminal proceedings; and no more of the forms and peculiar writs of that Code than might be found necessary to carry out the objects contemplated by that adoption."

**13.** Apparently the same justice who had written for the court just a year before in *Courand v. Vollmer,* 31 Tex. 397 (1868), was not satisfied with his effort at understanding, *viz:*

"This act [of January 20, 1840], therefore, substituted the common law of England in place of the civil law as 'the rule of decision,' and for this only. It did not adopt the common law of England as a rule of practice, or to be used except when something was to be decided. This, of course, contemplated judicial decisions, and was intended for the direction of the judiciary to resort to the unwritten law of England in those cases where the statutes are silent."

**14.** That section, it will be remembered, mandated Congress to introduce by statute the common law of England and in criminal cases made it the rule of decision.

Then, when the Supreme Court came to confront the term again, it confessed, "What is meant by 'the rule of decision' we do not pretend to say . . .," *The Indorsement Cases,* 31 Tex. 693, 697 [13] (1869).

The constitutional and statutory provisions promulgated by the Republic turned out to be shortlived. The 1845 Constitution of the State of Texas omitted the command of Article IV, § 13, supra,[14] and did not contain any mention of incorporating the common law of England in either civil or criminal cases. See Article IV, 3 Vernon's Texas Constitution 551–554.[15] Implementing the requirement in Article 4, § 10 that in all criminal cases, except capital and where penalties were specifically imposed by law, the jury shall find and assess the punishment to be inflicted and fine imposed, the Legislature passed the Act of April 30, 1846, 2 Gammel's Laws 1467; it enacted a law regulating juries by the Act of May 4, 1846, *id.,* 1476 ff; an Act to Regulate Proceedings in the District Courts was passed May 13, 1846, *id.,* 1669 ff.[16]

The First Legislature of the State of Texas imposed on the attorney general the duty to revise, digest and arrange the civil and criminal law and to lay before the next session of the Legislature his report. However, that project may have bogged down for the next session authorized the Governor to subscribe to a number of copies of a Digest of the Laws of Texas proposed to be published by O.C. Hartley, with the proviso

**15.** Likewise the Constitution of 1876 is devoid of reference to the common law of England.

**16.** Section 2 of the last act mentioned provided that "no civil suit be instituted, nor any process be had in any suit on Sundays, except in cases of attachment or sequestration." *Id.,* at 1671. There is no other expression indicating that the Legislature was retaining any portion of the common law, particularly the canon from which derived. Moreover, this act appears to relate to civil proceedings, *Stinson v. State,* 5 Tex.App. 31 (Ct.App.1878), leaving criminal cases to be regulated by the Constitution and other statutes also enacted in 1846. Thus, it may be reasoned that the common law had ceased to be "the rule of decision" in criminal cases.

that they be delivered to the Secretary of State within twelve months. Act of December 18, 1849, 3 Gammel's Laws 447–448. Hartley's Digest was published in 1850. However, soon a penal code and a code of criminal procedure were compiled by a commission, presented to the Legislature and by it adopted through passage of the Act of August 26, 1856.

Section 27 of the code of criminal procedure contained the pregenitor of present Article 1.27, V.A.C.C.P. It was amended, though, by the Act of February 15, 1858, and then provided:

> "Whenever it is found that this Code fails to provide a rule of procedure in any particular state of case which may arise, and is therefore defective, the rules of the common law shall be applied and govern."

What had been an uncertain "rule of decision" now became a dormant rule of procedure. But, more importantly, Section 27 shifted the impact of the common law, moving it from being the "rule of decision" unless inconsistent with Texas law to a position of resort when the code of criminal procedure did not provide an applicable rule of procedure. *Bloss v. State,* 127 Tex.Cr.R. 216, 75 S.W.2d 694, 696 [17] (1934); see *Robbins v. State,* 73 Tex.Cr.R. 367, 166 S.W. 528, 529 [18] (1914). And early on quick resort to the common law was viewed with disdain. See, e.g., *Leeper v. State,* 29 Tex. App. 63, 14 S.W. 398 (Ct.App.1890):

> "We shall not enter upon an investigation and review of authorities, for whatever may be the common-law rule, or the rule established by the decisions of other states, we consider that in the decision of this question we must be controlled by

our statute. In this state for more than 30 years we have had a Penal Code and a Code of Criminal Procedure, which, having been carefully prepared by distinguished, experienced, and able jurists, were adopted by the legislature. . . . . We regard it as the imperative duty of this court, and of all other courts of this state, in the trial and determination of causes, to be guided and controlled by the statutes of this state, whenever there is a statute applicable to the question presented. Our observation is that many errors have crept into the decisions of the courts of this state, especially in criminal cases, by following common-law rules and decisions of other states, overlooking our own statutes. These errors should be corrected whenever detected, and a strict adherence to statutes should be the rule governing courts in their decisions."

14 S.W. at 400 (Opinion on Rehearing).

Admitting their existence, we need not critique decisions of the Supreme Court, the former court of appeals nor the Court rendered prior to 1965, when the current code of criminal procedure was enacted. Though they found and applied the common law *cum* church canon, some neglected to look for applicable statutes and some looked but discovered none.[19] On the other hand, in *Bloss v. State,* supra, though issuing a search warrant requires a magistrate to exercise judicial discretion, the Court liberally construed what was then Article 310, C.C.P. so as to authorize a magistrate to issue a search warrant to search for and seize stolen property on Sunday because that authority was found to be invoked "*whenever* written sworn complaint is made to such magistrate." [Emphasis by the Court.]

---

17. "If, when liberally construed, a provision of the Code can be held applicable to a given state of facts, the rule of procedure at common law may not be followed."

18. "At common law, the rule which in civil cases excluded the husband and wife from testifying against each other was the same as that which is announced by our statutes with regard to criminal cases. There is no law of this state which governs or regulates the admission of declarations of the wife affecting

the husband, when they constitute a part of the res gestae; and, there being no specific rules prescribed by statute, other rules of the Code relegate us to the common law for the rules which are to govern."

19. See, e.g., *Harper v. The State,* 43 Tex. 431 (1875); *Shearman v. The State,* 1 Tex.App. 215 (Ct.App.1876); *Robbins v. State,* supra; *Guerrera v. State,* supra; *Price v. State,* 157 Tex. Cr.R. 625, 252 S.W.2d 167 (1952).

Turning to the record in the cause at bar, we see that on January 24, 1980—a Thursday—the trial court charged the jury on the merits of the case and the argument that followed ended at 9:45 p.m. The jury deliberated the next day and returned its verdict of guilt at 8:35 p.m. On Saturday afternoon the punishment phase of the trial began, the State's resting its direct presentation of evidence at 9:37 p.m. The jury had expressed an earnest desire "to begin tomorrow morning as early as possible" and to continue consistent with breaks to which the court and jurors had become accustomed, explaining that they "decided to pass on going to church..." The trial judge ordered the proceeding to reconvene at 8:00 a.m., Sunday, January 27. To the objection of counsel, the judge remarked that he was taking "into strong consideration" the expressed desires of the jury.

Beginning Sunday morning the defense presented its evidence; all parties closed at about 3:00 p.m. After a charge was drafted and objections were heard the final charge was read to the jury at 6:15 p.m., followed by arguments of counsel. The jury retired at 8:28 p.m. with every indication that it was free to deliberate and to return its verdict on punishment at its convenience.

The trial court did not err in conducting a part of the "sentencing proceeding," including submitting its charge on punishment to the jury, on Sunday.

One stated objective of the code of criminal procedure is "To insure a trial with as little delay as is consistent with the ends of justice." Article 1.03, V.A.C.C.P. All are admonished that its provisions "shall be liberally construed" to attain stated objects intended by the Legislature. Article 1.26, id.

In 1967 the initial version of Article 37.07, V.A.C.C.P., was completely revised, and to subdivision 2 was added, inter alia, paragraph (d), reading in pertinent part:

"(d) In cases where the matter of punishment is referred to the jury, the verdict shall not be complete until the jury has rendered a verdict both on the guilt or innocence of the defendant and the amount of punishment, where the jury finds the defendant guilty."

Today that prerequisite of a completed verdict is in Section 3(c) of Article 37.07, supra, and the introduction by Article 37.071, V.A. C.C.P., of "a separate ... proceeding to determine whether the defendant shall be sentenced to death or life imprisonment," did not remove a capital case from application of the general statutory definition of a completed verdict. Ex parte Bailey, 626 S.W.2d 741 (Tex.Cr.App.1981); Eads v. State, 598 S.W.2d 304 (Tex.Cr.App.1980); see Ocker v. State, 477 S.W.2d 288, 291 (Tex.Cr.App.1972); see also Evans v. State, 614 S.W.2d 414, 417 (Tex.Cr.App.1980).

Moreover, Article 37.071(a), supra, expressly provides that the "sentencing proceeding" shall be conducted "before the trial jury as soon as practicable," and (b) mandates that "on conclusion of the presentation of evidence" the trial court "shall submit" the prescribed special issues in its charge to the jury.

Determining it "practicable" to do so, the trial court began the punishment phase Saturday afternoon; giving strong consideration to expressed wishes of jurors, the judge reconvened the proceeding the next morning, Sunday, and, when presentation of the evidence was completed, charged the jury that same afternoon. Liberally construing Articles 37.07, § 3(c) and 37.071, §§ (a) and (b), supra, we do not offend our heritage in finding, as we should, that in this particular state of case the trial court was authorized by those rules of procedure to endeavor to complete the trial of the case by receiving the verdict of the jury on punishment without further undue delay.[20]

Guerrera v. State, supra, is bottomed on the common law of England as perceived by the Tennessee Court more than on the law

---

**20.** Even the common law permitted a court to receive a jury verdict on Sunday. Price v. State, supra, 252 S.W.2d at 168 and cases cited

therein; Rowan & Hope v. Valadez, 258 S.W.2d 395, 400 (Tex.Civ.App.—San Antonio 1953, writ ref'd n.r.e.).

laid down by our own forebearers and framers in Texas. Their total rejection of a national religion and their immediate creation of a wall of separation between church and state are at war with the notion that at the same time they adopted as a part of their law a canon first promulgated by the early Christian Church and later accepted by English rulers—"defenders of the faith." In a real sense the *Guerrera* opinion is an aberration in our law, and its holding that charging a jury on a Sunday was reversible error is now overruled.

Appellant contends the charge given the jury for their deliberations on guilt or innocence was fatally defective in that it failed either to instruct the jury that Rencher was an accomplice witness as a matter of law or to instruct the jury to decide the fact question of whether Rencher was an accomplice. Appellant made timely objection to the court's failure to instruct the jury in this regard. A conviction may not be based on the uncorroborated testimony of an accomplice witness. Article 38.14, V.A.C.C.P.

 The evidence does not show that Rencher was indicted for the murder for which appellant was on trial, so as to make her an accomplice as a matter of law. *McCloud v. State,* 527 S.W.2d 885 (Tex.Cr. App.1975). When there is a question whether a witness is an accomplice, it is proper to submit that issue to the jury, and this is sufficient even though the evidence appears to preponderate in favor of the conclusion that the witness is an accomplice as a matter of law. *Brown v. State,* 640 S.W.2d 275 (Tex.Cr.App.1982). It is only when the evidence clearly shows that the witness is an accomplice as a matter of law that the trial court must so instruct the jury. *Arney v. State,* 580 S.W.2d 836 (Tex. Cr.App.1979).

We cannot say that the trial court erred in failing to instruct the jury that Valerie Rencher was an accomplice witness as a matter of law. However, in light of the evidence as set out below in detail, the trial court's refusal to instruct the jury to decide the fact question whether Rencher was an accomplice witness was reversible error.

On the evening of December 11, 1978, at approximately 7:00 or 7:30 p.m., appellant and his codefendant, James Charles Manuel, in a stolen two door automobile driven by appellant, arrived at appellant's home in Bryan. They picked up appellant's brother, Curtis Paul Harris, and Curtis's 15 year old girlfriend, Valarie Rencher.[21] The four of them rode around for a while before pushing appellant's own car back to his house.

They next drove to the home of one of Rencher's friends. On the way there the car ran off the road, over a sign, and into a fence. They moved the sign in order to free the car, and proceeded to their destination. Rencher knocked on the door of her friend's house, but when no one came to the door she returned to the car. Appellant said the car would no longer start, and he and the other males began cursing the car and attacking it, ripping the interior and breaking a window.

When a man came out onto the porch of a nearby house, appellant, without approaching the house, asked him if he had any "booster cables," but the man replied that he did not have any at that location.[22] Appellant said, "Twelve miles is a long way to walk," and they began walking along the road. The man on the porch went back inside. When they saw the lights of an approaching pickup truck appellant said they were going to ask the driver for a boost. Appellant stood in the truck driver's path, "flagging him down," and asked him for help. The driver positioned the truck nose to nose with the car and got out his booster cables.[23]

---

**21.** The following version of the facts is taken from the trial testimony of Rencher, except where indicated. Appellant, his brother, and Manuel did not testify.

**22.** The man on the porch could not identify appellant at trial.

**23.** This Good Samaritan, Timothy Merka, will hereafter be referred to as "victim" or "deceased."

Appellant and the deceased attempted for about 20 to 30 minutes to start the car, while the others stood out in the cold and watched. The deceased began to get impatient and suggested that someone else down the road could probably tell them what was wrong with the car. Appellant insisted that the deceased keep trying to start the car. Manuel and appellant disappeared behind the upraised lid of the car's trunk. When they emerged the deceased was standing in front of the truck's left headlight. Rencher and Curtis Harris were on the right side of the truck near the front wheel.

Appellant and Manuel came out from behind the car and approached Rencher and Curtis Harris, appellant in the lead. Manuel, stopping near the car's left door, said to appellant, "Man, my arm is still out of place." Appellant walked up to Curtis Harris and Rencher. With Rencher standing between the two of them appellant whispered to his brother, "We're going to drive this man." (sic)

Rencher testified that she did not notice anything pass between the brothers other than the whispered words. Nevertheless, Curtis Harris, carrying a "jack," which he had not possessed a moment earlier, began to "drift off" behind the truck, around to the open door on the left side. The deceased had unhooked the booster cables and was standing at the left front corner of the truck facing appellant as appellant approached between the vehicles. Neither Rencher nor Manuel had moved or spoken further. Both remained on the opposite side of the vehicles from the deceased.

Appellant pushed the deceased in the chest, and when the man fell on his back appellant sat on his chest and pinned his arms down by holding his wrists. Curtis Harris approached and, holding the jack with both hands, struck the deceased on the head. The deceased said, "Okay, what do you want?" Rencher said, "Curtis, don't hit him no more." Curtis Harris hit the de-

ceased again, harder than before. Rencher, concluding at that point that the deceased must be dead, opened the door on the right side of the deceased's truck, climbed in, and slid over near the steering wheel.

Curtis Harris struck the deceased approximately six more times, then left the body, walked between the vehicles, entered the right door of the truck, and moved over to sit next to Rencher. On his way between the vehicles he passed Manuel, who was walking toward the deceased. Manuel, carrying the deceased's wallet, left the body, entered the truck and sat on the far right. Appellant went to the back of the truck, then to the front to let the hood down before he entered the truck and drove away. They listened to music on the radio and tape deck as they drove.

The four returned to the Harris house, where appellant and his brother changed clothes. Appellant had blood on his *pants.* Rencher had blood on the right side of her jacket. At trial she first explained that she got the blood on her jacket from sitting in the truck next to appellant, who was on her left. Later she said the blood must have come from Curtis Harris, who was sitting on her right. Curtis Harris had some blood on his tennis shoes.[24]

Rencher had no explanation for how the body of the deceased came to be found, wrapped in the booster cables, lying not on the road where she last reported seeing it but off to the side in a ditch. She denied going near the body and insisted that "the only reason I got blood on my jacket was because I was sitting between two bloody people." Defense counsel used prior statements made by Rencher to the authorities to show that her recollection of whose clothing had blood on it varied from one statement to the next. Rencher evaded defense questions concerning whether she had told authorities in her first statement about returning to the Harris house for the change of clothing.

24. A Department of Public Safety laboratory report, introduced into evidence as State's Exhibit 68, showed a small amount of blood only on the left tennis shoe. It was an amount insufficient for determining blood type.

From the Harris house the four of them set out for Houston but went to Waller instead. On the way there Manuel scattered along the highway the papers he found in the truck. At Waller the males left Rencher alone in the truck for a short time. From there the four returned to Bryan, where Rencher and Curtis Harris got out of the truck, and the others drove off to dispose of it. Rencher spent the night with Curtis at the Harris house.

Rencher testified at trial that she had no idea what appellant meant when he whispered across her to his brother that they were going to "drive" the deceased. However, she admitted making prior statements, in response to questions posed by her attorney, that she understood at the time of the murder what "drive" meant and that "it meant jump on him." She explained at trial that in her earlier statement she meant that "when I said at the time it meant to jump on him, that was when they had jumped on him, but the time when they was coming around saying 'drive,' I did not know what drive meant." Rencher then admitted that her prior statement which she had just attempted to explain at trial had included this exchange:

"Mr. Steelman [Rencher's attorney]: Okay, is there any reason why you didn't warn the man at that time?
Rencher: Well, I feel like the man should have known that something was going to happen."

Rencher thus took the awkward position at trial that she, who knew the Harris brothers and had heard their whispered plan, had absolutely no idea they were going to attack the deceased, and that she did not warn him because he, who did not know them and apparently had not heard the whisper, should have known he was in danger. Of course, it may be inferred from her excuse for not warning the deceased that *she did know* he was about to be attacked.

■ When it is clear from the evidence that the witness was *not* an accomplice, no

charge need be given to the jury either that a witness is an accomplice as a matter of law or that the jury is to decide whether the witness is an accomplice. *Villarreal v. State,* 576 S.W.2d 51 (Tex.Cr.App.1979). (Deaf mute woman present in car outside convenience store could not have heard shots, and record did not reflect when she knew of robbery.) *Silba v. State,* 161 Tex. Cr.R. 135, 275 S.W.2d 108 (1954). (Sixteen year old took no part in attack but left scene with attackers, was arrested and detained in juvenile home.) However, if there is a *conflict in the evidence* the court should charge the jury on the question of whether the witness was an accomplice *as a matter of fact. Singletary v. State,* 509 S.W.2d 572 (Tex.Cr.App.1974); *Dears v. State,* 506 S.W.2d 606 (Tex.Cr.App.1974); *Silba v. State,* supra. See especially *Drummond v. State,* 624 S.W.2d 690 (Tex.App.—Beaumont 1981), with facts strikingly similar to the instant case.

In the present case Rencher's own testimony provided conflicting evidence about her role in the murder. Her version of the events was riddled with inconsistencies and significant gaps regarding such particulars as (1) how Curtis Harris got the jack, (2) why Rencher did not warn the deceased, (3) at what point she realized what "drive" meant, (4) how she got blood on her coat, (5) when she noticed blood on the others, and (6) how and by whom the body was moved.

Rencher admitted making prior statements, in response to questions by her attorney, indicating she believed that she was guilty because she was "just a part of it as they were." [25] "A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt." 2 Ray, Texas Evidence 1538 (3rd ed. 1980). Rencher provided the jury with further evidence of "consciousness of guilt" by first denying and then admitting she had tried to escape from custody. *McWherter v. State,* 607 S.W.2d 531 (Tex.Cr.App.1980). *Ray, supra.* She also

---

**25.** Rencher attempted to explain away such statements by saying that she merely had repeated what her attorney told her.

admitted that no one forced her to remain with the Harris brothers and Manuel after the murder and that she could have gone home instead. Compare *Drummond v. State,* supra, (witness testified she remained with and obeyed her murderer-boyfriend out of fear).

Rencher further testified that she had appeared as a witness in the trial of Curtis Harris and that the prosecutors had "gone over" her testimony with her on several occasions before that trial and before the instant trial. She admitted that she had been placed in jail and later in a juvenile detention facility for approximately six months after the murder.

Carolyn Hensarling testified that, as Justice of the Peace, she advised Rencher of her rights after arrest and told Rencher that she stood "accused of murder."

Sarah Ryan, who represented the State in Rencher's juvenile case, testified that Ryan had begun proceedings to certify Rencher so that she could be indicted and tried as an adult, but Ryan had not completed the process.[26] Ryan claimed that the District Attorney did not instruct her to delay or terminate certification.[27] Invoking the portions of the Family Code prohibiting disclosure of juvenile proceedings, Ryan refused to state what offense was specified in the Petition for Waiver of Juvenile Jurisdiction or for what offense, if any, Rencher was adjudicated. See V.T.C.A. Family Code, §§ 51.-14–51.16, Human Res. Code, §§ 61.066–61.-073.

Rencher testified that she had agreed to a "deal" with the State that in exchange for her testimony the State would recommend she receive no more than a ten year sentence if she were tried as an adult.

In Rencher the jury was presented with a witness whose testimony formed virtually the State's entire case against appellant, *McCloud v. State,* supra, and one who had every reason to shade her testimony to downplay her own involvement in that offense. When asked to characterize her role, Rencher certainly made the least of it:

"Q [Prosecutor]: My last question, Valarie, what part did you play in this robbery-murder of Tim Merka that you have just told this jury about?

[Objection to "bolstering" overruled.]

A: ... I didn't play no part in this case, but the only thing I done was ride in the car and ride in the truck, and went to Waller and came back to Bryan."

Other testimony by Rencher suggests her role may have been less cut and dried and more culpable.

At trial Rencher testified that she entered the truck because she concluded the victim was dead, and she did not wish to watch as Curtis Harris continued to strike him. Yet she continued to watch what she could through a crack between the upraised hood and the motor. She said no one told her to get into the truck and no one gave her permission. Rencher stated that she slid over next to the steering wheel, "because I didn't know who was going to drive. I wasn't going to drive." By this and other testimony above, Rencher raised the issue whether when she took possession of the deceased's truck she knew they were robbing and killing him.

 An accomplice witness is someone who participated with another before, during or after the commission of a crime; one is not an accomplice witness who cannot be prosecuted for the offense with which the accused is charged. *Ferguson v. State,* 573 S.W.2d 516 (Tex.Cr.App.1978). While mere presence of an accused at the scene of an offense is not sufficient in itself to support a conviction, V.T.C.A. Penal Code, § 7.02(a)(2), it is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show the accused was a participant. *Medellin v. State,* 617 S.W.2d 229 (Tex.Cr.App.1981). In determining whether a person was a participant in an offense the courts may look to events before, during, and after commission of the

---

**26.** See V.T.C.A. Family Code, § 54.02.

**27.** If indicted for murder in this case, Rencher would have been an accomplice as a matter of law. *McCloud v. State,* supra.

offense, including actions which show an understanding and common design to do a certain act. *Alexander v. State*, 607 S.W.2d 551 (Tex.Cr.App.1980). While flight alone will not support a guilty verdict, it is a circumstance from which an inference of guilt may be drawn. *Holloway v. State*, 525 S.W.2d 165 (Tex.Cr.App.1975).

In *Russell v. State*, 598 S.W.2d 238 (Tex. Cr.App.1980) the appellant took his 17 year old girlfriend along during an abduction and capital murder. She testified that she had no idea what was going on, she remained in the car, she was very scared, she knew it was something bad after she heard gunshots from the woods, and after the shooting appellant took her home. We held her *mere presence* at the scene, absent any knowledge of what was about to transpire, did not *compel the conclusion* that she was an accomplice so as to necessitate an instruction that she was an accomplice *as a matter of law.*

The State maintains that no evidence was adduced at trial tending to show Rencher participated in the murder, other than her presence at the scene, and that mere presence does not compel the conclusion one is an accomplice. The State likens Rencher to the witness in *Russell v. State*, supra. However, unlike the witness in that case, Rencher made inconsistent statements regarding her knowledge of what was happening. In contrast to the extremely frightened woman in *Russell*, who remained in the car throughout and who went straight home, Rencher not only remained willingly with the killers but was the first of the four to enter the victim's truck— *while Curtis Harris was still in the act of bludgeoning him.*

In *Russell* the Court did not address the question whether it was necessary to instruct the jury to decide the *fact question* whether the witness was an accomplice. *Russell* is inapposite to this ground of error.[28]

In *Valdez v. State*, 623 S.W.2d 317 (Tex. Cr.App.1981) (Opinion on State's Motion for Rehearing) the Court upheld a vehicle burglary conviction based on evidence that appellant was present at the scene of the crime and fled with the perpetrator, who left two of the stolen tapes in appellant's vehicle, which tapes appellant returned to him for restoration to the owner. The evidence in the present case showed that Rencher was present and fled the scene of the murder with the others in the deceased's vehicle, listening to the radio and tape deck. Furthermore, she had *overheard* (and may or may not have understood) what was about to happen. She wound up with blood on her, took possession of the truck for the killers while the killing was in progress, willingly remained with them, was arrested and held for six months, attempted to escape from custody, expressed the belief at one point that she was guilty, made a deal with the prosecution for her testimony and gave inconsistent accounts of what had transpired.[29]

■■■ Considering all of the evidence of Rencher's involvement, both inculpatory and exculpatory, we find the trial court erred in failing to submit to the jury the question of whether Rencher was an accomplice witness. This is so especially in the light of the fact that the State repeatedly justified the admission into evidence of extraneous offenses or bad acts committed by appellant, such as leaving the scene of the automobile accident described earlier, on

**28.** In *Colunga v. State*, 527 S.W.2d 285 (Tex.Cr. App.1975) a girl of fourteen or fifteen went along for the ride when her boyfriend or common law husband participated in a robbery and murder. She did not otherwise participate and refused a miniscule "cut" of the money taken. Submission of the question to the jury of whether she was an accomplice was held to be sufficient. No instruction that she was an accomplice as a matter of law was required on a showing of mere presence.

**29.** As further example of said inconsistencies, according to Texas Ranger Bob Connell's trial testimony, Rencher initially told him that Danny Harris, not Curtis, was the first to strike the deceased with the jack. At trial she testified she saw only the latter strike the deceased with the jack.

the ground that the State needed to "depend on every shred of evidence to corroborate" Rencher in case she were found to be an accomplice witness. When Manuel's defense counsel replied that he could not see "how the State can with a straight face argue that a minor traffic violation corroborates testimony as to how a capital murder occurred," the trial court assured him, "That's a fact question as you are well aware of, Mr. Payne, which will be resolved by the jury, charged to the jury."

The jury should have been so charged on whether Rencher was an accomplice and whether her testimony was corroborated. Her actions and testimony and the evidence as a whole, especially her action in taking possession of the truck without permission or instruction by anyone, while the killing was still in progress, raised the fact issue of whether, "prior to or contemporaneous with the criminal event," she was a party to the agreement to kill the deceased for his truck. *Urtado v. State*, 605 S.W.2d 907, 911 (Tex. Cr.App.1980); *Suff v. State*, 531 S.W.2d 814, 817 (Tex.Cr.App.1976).

Relevant in this regard is the denial by the trial court of Manuel's motions for instructed verdict of not guilty at the close of the State's case and at the close of all the evidence. No evidence had been introduced to controvert Rencher's testimony to the effect that before and during the killing Manuel stood as far from the deceased as did she, and that Manuel's only remark was that his arm was out of place. Manuel only walked to the body to get the wallet *after* Rencher had taken possession of the victim's truck and *after* Curtis Harris had delivered the final blow. Manuel was the only one of the four on whom Rencher saw no blood.[30]

The trial court, having determined the evidence adduced at trial was sufficient to submit to the jury the question of Manuel's guilt or innocence, should have submitted the question whether Rencher was an ac-

complice, whose testimony needed corroboration. The failure to do so was error necessitating reversal.

Accordingly, the judgment of conviction is reversed and the cause remanded to the trial court.

ONION, P.J., and ODOM, J., concur in result.

---

**30.** Furthermore, her account of the relative positions of all the persons at the scene, placing the deceased as close to her as Manuel, makes it unlikely that Manuel could have heard, as she did, the whispered words passing between the Harris brothers: "We're going to drive this man."